M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Brandon P. Jack (SBN 325584)
**EMERY | REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
916.823.6955 (Tel)
206.441.9711 (Fax)
*anderson@emeryreddy.com*
*gregory@emeryreddy.com*
*brandon@emeryreddy.com*

Heather M. Lopez (SBN 354022)
Mike Acciavatti*
**MILBERG PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
(331) 240-3015
*hlopez@milberg.com*
*macciavatti@milberg.com*

[*Additional Counsel listed on Signature Page*]

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MICHAEL J. HARHAY, WILLIAM F. SCHMIERER, ASHLEY GRIMES, and CAMERON DIEGLE** individually and on behalf of all other similarly situated,<br><br>Plaintiff(s),<br>v.<br>**LOWE'S HOME CENTERS, LLC,** a North Carolina Limited Liability Company; and **LOWE'S COMPANIES, INC.**, a North Carolina Corporation.<br><br>Defendants. | Lead Case: 2:26-cv-01757-DC-JDP<br><br>Member Case: 2:26-cv-01760-DC-JDP<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**1. VIOLATION OF CALIFORNIA'S ALPR PRIVACY ACT, CAL. CIV. CODE §§ 1798.90.5, *ET SEQ.* - UNAUTHORIZED ACCESS AND USE OF ALPR INFORMATION;**<br>**2. VIOLATION OF CALIFORNIA'S ALPR PRIVACY ACT - FAILURE TO IMPLEMENT CODE-COMPLIANT PRIVACY POLICY AND MAINTAIN RECORD OF ACCESS, CAL. CIV. CODE §§ 1798.90.51(b), 1798.90.52, 1798.90.53(b);** |

**3. INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION, ARTICLE I, § 1;**
**4. INTRUSION UPON SECLUSION;**
**5. VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;** and
**6. NEGLIGENCE AND NEGLIGENCE PER SE;**

**JURY TRIAL DEMANDED**

Plaintiffs Michael J. Harhay, William F. Schmierer, Ashley Grimes, and Cameron Diegle bring this Consolidated Class Action Complaint against Lowe's Home Centers, LLC and Lowe's Companies, Inc. (collectively, "Lowe's" or "Defendants"), individually and on behalf of all others similarly situated, and allege upon personal knowledge and their counsel's investigations as follows:

## I. NATURE OF THE CASE

1. America's second-largest home improvement retailer is operating a covert mass surveillance system across its California stores. Lowe's Home Centers, LLC and Lowe's Companies, Inc. operate 112 retail stores[1] across California and have installed automated license plate recognition ("ALPR") cameras, primarily through their ALPR vendor Flock Group, Inc., d/b/a Flock Safety ("Flock"), at the entrances and parking lots of their California stores.[2] These cameras capture the license plate, make, model, color, and distinguishing features of every vehicle entering Lowe's properties, log that data with precise timestamps and location information, and feed it into a centralized, searchable database accessible to law enforcement agencies across the country. Upon information and belief, Defendants participate in installing, operating, and using the ALPR systems deployed at their California stores. Their involvement is not limited to permitting a third-party vendor

[1] Lowe's Store Directory, California, lowes.com (last visited July 6, 2026); Joseph Cox & Jason Koebler, *Home Depot and Lowe's Share Data from Hundreds of AI Cameras with Cops*, 404 MEDIA (Aug. 5, 2025), 404media.co/home-depot-and-lowes-share-data-from-hundreds-of-ai-cameras-with-cops

[2] Joseph Cox & Jason Koebler, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (Aug. 5, 2025), https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows

to install cameras on their premises. Defendants selected or approved the deployment of ALPR technology for their commercial security and loss-prevention purposes and participate in decisions concerning the administration, access, use, retention, and disclosure of information generated by those systems. Plaintiffs allege that each Defendant qualifies as an ALPR operator, an ALPR end-user, or both, based on the functions it actually performs.

2. Lowe's published ALPR-related disclosures within its general privacy statement, but the existence of those disclosures does not establish compliance with the ALPR Act. The Act requires operators and end-users to implement and conspicuously post usage and privacy policies addressing specified mandatory subjects. Plaintiffs allege that Lowe's disclosures fail to adequately describe material aspects of its actual ALPR practices, including the purposes, processes, and restrictions governing third-party access to ALPR information and the retention and destruction of information maintained through its vendor's systems. Every day, the vehicles, and the movements, habits, and lives, of California residents shopping at Lowe's are being captured and funneled into a national surveillance network, without conspicuously-posted notice sufficient to satisfy California law. Plaintiffs allege that Lowe's disclosures, considered in light of their placement, content, and the actual operation of Defendants' ALPR systems, fail to provide the information required by California law concerning material aspects of access, third-party sharing, monitoring, and retention and destruction practices.

3. Flock is a technology company that specializes in automatic license plate recognition systems, commonly referred to as Automatic License Plate Readers ("ALPRs"). ALPRs are advanced camera systems that can automatically detect and record an individual's "Vehicle Tracking Data," and then aggregate and use that information to track an individual's movements. The term "Vehicle Tracking Data" as used herein means license plate numbers, vehicle characteristics (including any and all data used by Defendants and/or Flock to identify a given vehicle), time-stamped records, and geographic location data reflecting a vehicle's location and movements through areas, along with any other information monitored, captured, collected, and/or aggregated by Flock's ALPRs and ALPR systems.

4. Flock's customers—including homeowners' associations, businesses, schools, law enforcement organizations, and anyone else willing to pay the approximately $2,500 annual fee for access to its enormous database of personal information—can install Flock's ALPRs on their property or around their community. Once installed, the ALPRs identify and create a detailed record of every vehicle that enters its view. Unlike a person at an intersection, these cameras never blink, they never sleep, and they see and remember everything. Every passing car is captured, and its license plate and other features are analyzed using proprietary machine learning programs.

5. More troubling is the fact that Flock's customers, like Defendant, who install the cameras on their properties are not the only ones that have access to the data collected by the ALPRs: When Flock's customers provide Flock with access to the recordings created by the customer's ALPRs, Flock then aggregates this data with information collected from thousands of other Flock ALPRs to create a centralized, highly detailed, searchable record of each driver's movements. Flock then grants its customers access to this vast surveillance database (referred to herein as the "Flock Safety Network" or "Flock Safety").[3] As a result, anyone with access to the Flock Safety Network can track the movements of anyone traveling within the reach of Flock's national camera network.

6. The scope of this mass surveillance is truly terrifying. Currently, there are ***at least 80,000*** Flock ALPRs operating in 49 states.[4] Through those ALPRs, Flock captures individuals' Vehicle Tracking Data through a staggering ***20-billion*** vehicle scans every single month,[5] generating an immense database of individuals' movements. All of this is only possible through Flock customers' installation of its surveillance cameras on their properties.

---

[3] *National LPR Network*, FLOCK SAFETY, https://www.flocksafety.com/products/national-lpr-network (last accessed March 6, 2026) (detailed Flock's nationwide shared data network); *Police cameras track billions of license plates per month,* NBC NEWS, https://www.nbcnews.com/tech/tech-news/flock-police-cameras-scan-billions-month-sparking-protests-rcna230037 (last accessed March 6, 2026) (highlighting Flock's "live national database.").

[4] *Flock Gives Law Enforcement All Over The Country Access to Your Location*, ACLU MASSACHUSETTS, https://data.aclum.org/2025/10/07/flock-gives-law-enforcement-all-over-the-country-access-to-your-location/ (last accessed March 10, 2026) (detailed Flock's ALPR surveillance network); *National LPR Network*, FLOCK SAFETY, https://www.flocksafety.com/products/national-lpr-network (last accessed March 6, 2026) (noting Flock's network operates across 49 states).

[5] *Police cameras track billions of license plates per month,* NBC NEWS, https://www.nbcnews.com/tech/tech-news/flock-police-cameras-scan-billions-month-sparking-protests-rcna230037 (last accessed March 6, 2026).

7. California enacted the ALPR Privacy Act (Cal. Civ. Code §§ 1798.90.5 *et seq.*) (the "ALPR Act" or "Act") precisely to prevent this kind of covert, large-scale surveillance of ordinary Californians going about their daily lives.

8. The Act imposes obligations on both ALPR "operators" and ALPR "end-users," including requirements concerning reasonable security procedures and publicly available usage and privacy policies. It additionally requires operators to maintain records of access and impose restrictions on the purposes for which ALPR information is used. Defendants' liability under the ALPR Act arises from their participation in both operating and using the ALPR systems deployed at their California stores. Plaintiffs allege that Defendants are ALPR operators because they participate in the administration and operation of those systems, and ALPR end-users because they access or use the resulting information for their own business purposes. Defendants are subject to the requirements applicable to both categories because they participate in the operation of their ALPR systems and access or use information generated through those systems. Among other things, the California Legislature recognized that, at a minimum, the public has a right to know that their Vehicle Tracking Data is being recorded and aggregated, and how that data will be used. Lowe's has failed to satisfy multiple mandatory requirements of the Act.

9. Beyond the statutory violation, Lowe's conduct is gravely dangerous. Public records obtained by the Electronic Frontier Foundation from the Johnson County, Texas Sheriff's Office, published by 404 Media on August 5, 2025, confirmed that the Sheriff's Office has access to tap into "Flock cameras at 173 different Lowe's locations around the U.S." Upon information and belief, Lowe's California deployments utilize the same Flock technology and network infrastructure described in the public reporting concerning Lowe's locations elsewhere in the United States. Plaintiffs allege that the extent to which particular California deployments participate in Flock's broader sharing arrangements is governed by configurations, permissions, and agreements within Defendants' or their vendor's possession. Documented instances confirm the same network has been used for civil immigration enforcement, First Amendment protest surveillance, and access by federal agencies including ICE, ATF, Air Force installations, and the GSA Office of Inspector General.

10. Upon information and belief, without disclosing their surveillance activities to the public as required by California law, Defendants installed Flock's ALPRs throughout their properties, capturing the Vehicle Tracking Data of every customer who visits or drives near their shopping centers and feeding that data into Flock's national surveillance network — accessible to law enforcement agencies across the country. The failure to provide conspicuous and substantively adequate disclosures was particularly consequential because Defendants did not merely permit surveillance equipment to be installed by an unrelated third party. Upon information and belief, Defendants affirmatively participated in establishing and administering the surveillance program, determined its commercial purposes, and used information generated through that program for loss prevention and security-related activities.

11. Defendants have not implemented or conspicuously posted on their Internet Web site a usage and privacy policy containing the mandatory and specific ALPR information required of ALPR operators and end-users under the ALPR Act.

12. While Defendant's website maintains a generic ALPR privacy policy, posted at https://www.lowes.com/l/about/privacy-and-security-statement (attached hereto as "**Exhibit A**"), Defendant's posted ALPR policy fails to satisfy the minimum requirements of the ALPR Act, in that Defendant has failed to minimally inform Plaintiffs and Class Members of the extent of its license plate surveillance operations, the law enforcement agencies with access to that data, and how long that data is definitively retained.

13. Plaintiffs themselves were deprived of the disclosures the Act required. Before and in connection with visiting Lowe's, Plaintiffs accessed Defendants' publicly available website to obtain information regarding Lowe's and its offerings. Plaintiffs did not encounter disclosures that Defendants operated or used ALPR technology, any link to an ALPR usage and privacy policy, or any information explaining what ALPR information Defendants collected, how that information was used, who could access it, whether and with whom it could be shared, or how long it would be retained. Plaintiffs likewise observed no signage at Lowe's locations disclosing Defendants' use of ALPR technology, did not notice the Flock ALPR cameras, and had no knowledge that Defendants were automatically capturing and recording information concerning their vehicles.

14. The information Defendants withheld, or were unable to find, with regard to their ALPR use, was information Plaintiffs wanted to know and would have considered in deciding whether to visit Lowe's. Had Defendants properly disclosed that Lowe's was collecting, using, accessing, and maintaining their ALPR information, and provided Plaintiffs with proper, conspicuous notice concerning the usage, access, sharing, retention, security, and other information California law required Defendants to make publicly available, Plaintiffs would have shopped elsewhere, rather than subject themselves and their vehicles to Defendants' undisclosed ALPR surveillance.

15. Defendants installed Flock's ALPRs on their properties in California, resulting in Plaintiffs and Class Members being tracked by Flock's mass surveillance network. However, Defendants ***never*** properly informed Plaintiffs or Class Members that their Vehicle Tracking Data was being captured, time-stamped, and recorded, nor that the resulting data being aggregated enabled the long-term tracking of Plaintiffs and Class Members' individual movements.

16. The California Court of Appeal in *Bartholomew v. Parking Concepts, Inc.*, No. A171546, decided February 5, 2026, confirmed that Defendant's conduct constitutes "harm" within the meaning of the ALPR Act. The court held that "[c]ollecting and maintaining individuals' ALPR information without implementing and making public the statutorily required policy harms these individuals by violating this right to know." *Bartholomew v. Parking Concepts, Inc.*, No. A171546, slip op. at 9–10 (Cal. Ct. App. 1st Dist. Feb. 5, 2026), as modified Feb. 27, 2026. Thus, the Court of Appeal recognized that collecting and maintaining ALPR information without implementing and publicly posting the statutorily required policy, adhering to and detailing the Act's requisite parts, can constitute harm to the individuals whose information is collected, independent of affirmative misuse of that information. Lowe's published disclosures omit information the Legislature specifically required Lowe's to provide concerning its collection, retention, use, and disclosure of their ALPR information.

17. Defendants knowingly violated the ALPR Act and caused the resulting harm. Defendants violated the ALPR Act by installing, using, and maintaining an ALPR system that collected and maintained Plaintiffs' ALPR information while also failing to properly implement and make conspicuously and publicly available the required usage and privacy policy mandated by

California law. Defendants knowingly caused harm, which was Plaintiffs' deprivation of the statutorily protected information concerning Defendants' ALPR practices, namely, Plaintiffs' right to know when, how, and to what extent Defendants were collecting, using, maintaining, and sharing Plaintiffs' ALPR information. Defendants knowingly caused that resulting harm because Defendants affirmatively chose to deploy and continue using Flock ALPR technology while also choosing not to provide persons subjected to its ALPR use the required disclosures detailed in ALPR Act.

18. Defendants' use of the Flock ALPRs is not just an invasion of privacy, but also a violation of the ALPR Act, in that Defendants did not publicly post a policy containing the usage and privacy information the statute requires.

19. Therefore, Plaintiffs seek, on behalf of themselves and a Class of similarly situated persons, to remedy these harms and assert the following claims against Defendant: (1) Violation of California's ALPR Privacy Act — Unauthorized Access and Use of ALPR Information; (2) Violation of California's ALPR Privacy Act — Failure to Implement Code-Compliant Privacy Policy and Maintain Record of Access; (3) Invasion of Privacy under the California Constitution, Cal. Const. Art. 1, § 1; (4) Intrusion Upon Seclusion; (5) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (6) Negligence and Negligence *per se*.

## II. PARTIES

20. Plaintiff Michael J. Harhay is a natural person and a citizen of the State of California, residing in Lafayette, California. During the class period, Plaintiff Harhay visited the Lowe's store located in Concord, California in Contra Costa County (Store No. 2604), on numerous occasions, including March 14, 2025 and April 21, 2025, where Plaintiff Harhay's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b). Had Plaintiff Harhay known that Lowe's was capturing and sharing his vehicle data with law enforcement in a manner not compliant with California law, Plaintiff Harhay would have taken steps to protect his privacy.

21. Plaintiff William F. Schmierer is a natural person and a citizen of the State of California, residing in Orangevale, California. During the class period, Plaintiff Schmierer visited the

Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including May 19, 2024, November 25, 2025, January 5, 2026, February 13, 2026, February 27, 2026 and March 25, 2026, where Plaintiff Schmierer's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b). Had Plaintiff Schmierer known that Lowe's was capturing and sharing his vehicle data with law enforcement in a manner not compliant with California law, Plaintiff Schmierer would not have patronized the property or would have taken steps to protect his privacy.

22. Plaintiff Ashley Grimes is a natural person and a citizen of the State of California, residing in Sacramento County, California. Plaintiff Grimes visited the Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including October 30, 2025, February 26, 2026, and March 30, 2026, where Plaintiff Grimes's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b). Had Plaintiff Grimes known that Lowe's was capturing and sharing her vehicle data with law enforcement in a manner not compliant with California law, Plaintiff Grimes would not have patronized the property or would have taken steps to protect her privacy.

23. Plaintiff Cameron Diegle is a natural person and a citizen of the State of California, residing in Sacramento County, California. Plaintiff Diegle visited the Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including December 26, 2025 and March 29, 2026, where Plaintiff Diegle's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b). Had Plaintiff Diegle known that Lowe's was capturing and sharing his vehicle data with law enforcement in a manner not compliant with California law, Plaintiff Diegle would not have patronized the property or would have taken steps to protect his privacy.

24. As a result of Lowe's failure to provide complete disclosures required by California law, Plaintiffs were deprived of statutorily mandated information concerning the collection, use, retention, and disclosure their ALPR information at the time Lowe's collected that information. Plaintiffs' injuries arise from the collection and maintenance of their vehicle-identifying information under those allegedly deficient disclosures, rather than solely from the possibility of future misuse of information belonging to other individuals.

25. In connection with visiting and shopping at Lowe's, Plaintiffs accessed Defendants' publicly available website on numerous occasions to obtain information concerning Lowe's. Nothing Plaintiffs encountered on Defendants' website properly or conspicuously disclosed that Defendants operated or used ALPR technology at Lowe's, the extent to which these systems operated, informed Plaintiffs that Defendants would automatically collect, use, maintain, and share their ALPR information, or directed Plaintiffs to any ALPR usage and privacy policy. Plaintiffs were unaware that Defendants' deficient ALPR policy was buried deep within Defendants' privacy policy. Plaintiffs' website visits occurred before or in connection with the store visits identified above. Plaintiffs did not encounter an ALPR-specific disclosure through the pages they reviewed, did not follow any link directing them to Lowe's ALPR usage and privacy provisions, and were unaware that such provisions appeared within Lowe's general privacy statement.

26. Plaintiffs did not receive Lowe's ALPR disclosures before the identified visits and did not know that Lowe's would collect and retain their vehicle-identifying information through a system capable of making that information available to third parties. Had Plaintiffs received the information California law required Lowe's to disclose, they would have avoided the surveillance by choosing another retailer or otherwise modifying their conduct.

27. Defendants failed to properly inform Plaintiffs, through the conspicuous, public posting on its website of a proper, complete usage and privacy policy as required under California's ALPR Law, that when they visited Defendants' stores, Defendants would record and track Plaintiffs' location, movements, and Vehicle Tracking Data and transmit that information to Flock for the unauthorized and illegal purposes set forth herein.

28. Plaintiffs did not observe any sign at any entrance to Lowe's, in its parking areas, or elsewhere on the properties informing them that Defendants operated or used ALPR technology, that information concerning their vehicles would be automatically captured and recorded, or that an ALPR usage and privacy policy was available for review.

29. Plaintiffs did not notice the Flock ALPR cameras during their visits and did not know that Defendant had deployed ALPR technology at Lowe's. Nothing Plaintiffs encountered when entering, traveling through, parking at, or shopping at Lowe's informed them that Defendants were automatically generating time- and location-specific ALPR records concerning their vehicles.

30. Because Defendants did not conspicuously post a usage and privacy policy containing the information the ALPR Act requires, Plaintiffs could not learn from Defendants that their ALPR information was being collected, used, aggregated, maintained, and shared. Plaintiffs' own review of Defendants' website did not reveal the surveillance because Defendants provided a deficient, incomplete ALPR policy buried deep within its own privacy policy, failing to adhere to the conspicuously-posted requirement.

31. Plaintiffs' alleged informational injuries are personal to them. Each Plaintiff alleges that Defendants collected and maintained information identifying that Plaintiff's vehicle at a specified California Lowe's location while failing to make available material information concerning the practices governing that collection and maintenance. Plaintiffs do not seek statutory relief merely because Flock maintains a nationwide surveillance network or because unrelated individuals may have been subjected to improper searches. Rather, each Plaintiff alleges that the statutory disclosure deficiencies affected the collection and maintenance of that Plaintiff's own ALPR information.

32. Had Defendants complied with the ALPR Act, Plaintiffs would have wanted to know and would have considered the information Defendants were required to completely, conspicuously disclose, before deciding whether to visit Lowe's, including complete, detailed disclosures concerning: the purposes for which Defendants collected, accessed, and used ALPR information; the persons authorized to access it; the training required of those persons; how the system was monitored for security and compliance; the purposes, processes, and restrictions governing sharing or transfer of the information; the person responsible for the ALPR system and information; the safeguards used

to ensure accuracy and correct errors; and the period for which the information would be retained and when it would be destroyed. Plaintiffs also would have wanted to know whether their ALPR information would be shared with or accessible to Flock, law enforcement agencies, or other third parties, and where that information could be transmitted or accessed.

33. This information was material to Plaintiffs. Had Defendants properly and conspicuously disclosed their use of ALPR technology, and the information California law required Defendants to make public, Plaintiffs would have shopped elsewhere rather than visit Lowe's and subject their vehicle information to Defendants' undisclosed ALPR collection and maintenance.

34. Plaintiffs' injuries arise from the collection and maintenance of information concerning Plaintiffs' own vehicle through the ALPR system deployed at the identified Lowe's locations, and not merely from the existence of Flock's nationwide network or surveillance of unrelated individuals.

35. Defendant Lowe's Home Centers, LLC is a limited liability company organized under the laws of the State of North Carolina with its principal place of business at 1000 Lowe's Blvd., Mooresville, North Carolina 28117. Lowe's Home Centers, LLC is the primary operating subsidiary of Lowe's Companies, Inc. and is the entity that owns and operates Lowe's retail store locations in the United States, including all California locations. California government regulatory actions identify Lowe's Home Centers, LLC as the specific entity operating Lowe's retail stores throughout California, including in Sacramento County. Lowe's Home Centers, LLC operates 112 retail stores in California, making California one of its largest single-state markets. Lowe's Home Centers, LLC qualifies as both an "ALPR operator" under Cal. Civ. Code § 1798.90.5(c) and an "ALPR end-user" under § 1798.90.5(a). Its alleged operator status arises from its participation in the deployment, administration, and operation of ALPR systems at California retail locations, while its end-user status arises from its access to and use of ALPR information generated through those systems for loss prevention, security, and related commercial purposes.

36. Lowe's Home Centers, LLC's operator and end user status is based not merely on its ownership or occupancy of the retail premises, but on its participation in the deployment, administration, and operation of the ALPR systems installed at those premises. Plaintiffs allege that

Lowe's Home Centers, LLC determines the purposes for which the systems are used, participates in decisions concerning authorized users and access permissions, and directs or authorizes the vendor's collection and maintenance of ALPR information on its behalf.

37. Defendant Lowe's Companies, Inc. is the publicly traded parent corporation of Lowe's Home Centers, LLC, incorporated in the State of North Carolina with its principal place of business at 1000 Lowe's Blvd., Mooresville, North Carolina 28117. Lowe's Companies, Inc. is traded on the New York Stock Exchange under the ticker symbol "LOW."[6] For fiscal year 2025 (ended January 30, 2026), Lowe's Companies, Inc. reported total net sales of approximately $83.7 billion.[7] Lowe's Companies, Inc. sets and controls enterprise-level vendor selection, security policies, and data governance for all Lowe's entities, including the decision to engage Flock Safety as the enterprise ALPR vendor and to configure ALPR data-sharing settings with law enforcement. Upon information and belief, Lowe's Companies, Inc. qualifies as both an ALPR operator and an ALPR end-user. Its operator status arises from its direct participation in enterprise-level decisions concerning the selection, deployment, administration, and governance of ALPR systems at Lowe's California stores, including the establishment of policies governing authorized access, system use, data retention, and disclosure. Its end-user status arises from its alleged access to and use of ALPR information generated through those systems for enterprise security, loss prevention, and related purposes. Plaintiffs allege that Lowe's Companies, Inc. exercised this authority directly and through personnel and agents responsible for implementing enterprise-level ALPR decisions. Plaintiffs seek to hold Lowe's Companies, Inc. directly liable for its own conduct, independently of its status as the parent corporation of Lowe's Home Centers, LLC.

38. The respective operational responsibilities of Lowe's Home Centers, LLC, Lowe's Companies, Inc., and Flock are not mutually exclusive. Plaintiffs allege that multiple entities may participate in operating the same ALPR system, including where one entity supplies technical infrastructure, another directs or controls material operational functions, and both participate in the

---

[6] Lowe's Companies, Inc. 10-K for fiscal year ended Jan. 30, 2026 (filed Mar. 2026); Lowe's Store Directory – California, lowes.com (last visited Mar. 29, 2026); Cal. Civ. Code § 1798.90.5(c).

[7] Lowe's Companies, Inc., Fiscal Year 2025 Q4 Earnings Release (Mar. 4, 2026), ir.lowes.com (last visited July 7, 2026).

collection, maintenance, access, or use of ALPR information. Flock's performance of technical services does not establish that Defendants lack operational responsibilities. Plaintiffs allege that each Defendant's statutory status must be determined by the functions it actually performs, rather than solely by its designation in its vendor agreements.

## III. JURISDICTION AND VENUE

39. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because: (a) the proposed class consists of more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed class is a citizen of a state different from at least one Defendant.

40. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

41. This Court has specific personal jurisdiction over Defendants because each Defendant has purposefully availed itself of the privileges of conducting business in California and has purposefully directed its conduct toward this State and this District. Defendants own, operate, and manage numerous retail locations throughout California, including within this District, and have deployed and utilized ALPR systems at those locations. Plaintiffs' and Class Members' claims arise out of and relate to Defendants' California-based conduct, including Defendants' collection, use, and storage of vehicle-identifying and location information through ALPR systems at its California properties.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendants' use of ALPR systems at locations within this District.

43. This action is properly maintained as a class action under Federal Rule of Civil Procedure 23.

//

//

# IV. FACTUAL ALLEGATIONS

## A. ALPR Technology and California's ALPR Privacy Act

44. Modern ALPR technology uses specialized cameras and software to automatically scan, record, and convert vehicle license plates into digital data. These systems are mounted at fixed, high-traffic locations and scan every vehicle that passes. ALPR cameras capture images of license plates using Optical Character Recognition ("OCR") technology to convert images into machine-readable text in real time.[8] While each camera captures one point in time, data from multiple cameras is merged to track and map a vehicle's movements across entire regions at all hours of the day, every day of the year.




*Figure 1: Flock Safety ALPR camera at a California Lowe's store parking entrance/exit. Lowe's ALPR system captures the vehicle data of California shoppers and feeds it into a national law enforcement database accessible to federal agencies.*

[8] Mario Lotmore, Somebody's watching me: Flock versus red light cameras in Lynnwood, LYNNWOOD TIMES (Nov. 10, 2025), lynnwoodtimes.com/2025/11/10/red-light

45. When ALPR data is aggregated, it can paint an intimate portrait of a driver's life and even chill First Amendment protected activity.[9] ALPR technology can be used to target drivers who visit sensitive places such as health centers, immigration clinics, gun shops, union halls, protests, or centers of religious worship. This concern is not theoretical: through analysis of twelve million searches logged across Flock's national network between December 2024 and October 2025, the EFF confirmed that more than 50 federal, state, and local agencies ran hundreds of searches through Flock's national network in connection with protest activity, using search terms such as "protest," "No Kings," and protest-specific vehicle descriptions.[10]

46. In 2015, California enacted the ALPR Act Cal. Civ. Code §§ 1798.90.5, *et seq*., to address the increasing use of ALPR systems and the privacy risks associated with the aggregation and storage of Vehicle Tracking Data. The Legislature enacted the statute against the backdrop of rapidly expanding surveillance technology capable of collecting and aggregating large volumes of location-based information about individuals.

47. The legislative history of the ALPR Act reflects a particular concern with the ability of ALPR technology to compile historical Vehicle Tracking Data, aggregate that information, and to do so without public notice or consent.

48. The Senate Committee on Transportation and Housing, when reviewing the ALPR Act proposal, explained that while license plates themselves are publicly visible, ALPR technology enables far more extensive monitoring because of its ability to systematically collect and aggregate Vehicle Tracking Data. The Committee noted that ALPR systems can capture thousands of license plates per minute and compare those plates against databases of vehicles associated with crimes or other alerts.[11]

---

[9] Jennifer Pinsof et al., Letter to Att'y Gen. Rob Bonta (Jan. 31, 2024), eff.org/files/2024/01/30/2024-01-31_letter_to_ag_bonta_re_sb_34_final.pdf; EFF, Automated License Plate Readers, sls.eff.org/technologies/automated-license-plate-readers-alprs (last updated Oct. 1, 2023).

[10] First Amendment Report, HAVE I BEEN FLOCKED?, haveibeenflocked.com/first-amendment-records (last visited July 7, 2026); Rindala Alajaji & Dave Maass, License Plate Surveillance Logs Reveal Racist Policing Against Romani People, EFF (Nov. 3, 2025).

[11] Senate Committee on Transportation and Housing (April 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150402_153639_sen_comm.html (last accessed March 5, 2026).

49. The California Assembly Committee on Privacy and Consumer Protection explained that ALPR systems "have the ability to record vehicles' attendance at locations or events that, although lawful and public, may be considered private."[12] The Committee further noted the potential sensitivity of such information, observing that "mobile LPR units could read and collect the license plate numbers of vehicles parked at addiction counseling meetings, doctors' offices, health clinics, or even staging areas for political protests."[13]

50. Against this backdrop, the Senate Committee on Transportation and Housing emphasized the risks created when ALPR systems compile and store location data over time. The Legislature expressed concern that ALPR technology allows the creation of large databases of Vehicle Tracking Data, enabling the reconstruction of an individual's movements and activities through the aggregation of time-stamped location records. As the Committee explained:

> Unlike other types of personal information that are covered by existing law, civilians are not always aware when their ALPR data is being collected. One does not even need to be driving to be subject to ALPR technology: A car parked on the side of the road can be scanned by an ALPR system.[14]

51. Given the immense risk of abuse at the expense of individuals' rights to privacy, the Senate committee noted the privacy concerns associated with ALPR technology, explaining:

> The collection of a license plate number, location, and time stamp over multiple time points can identify not only a person's exact whereabouts but also their pattern of movement.[15]

52. To address these privacy concerns, the California Legislature imposed specific requirements on entities operating or using ALPR systems. As the Legislature stated, the purpose of the ALPR Act is to ensure "minimal privacy protections by requiring the establishment of privacy

---

[12] Assembly Committee on Privacy and Consumer Protection – Bill Analysis for SB 34 (July 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150706_104259_asm_comm.html (last accessed March 5, 2026).

[13] *Id.*

[14] Senate Committee on Transportation and Housing (April 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150402_153639_sen_comm.html (last accessed March 5, 2026).

[15] *Id.*

and usage protection policies for ALPR operators and end-users. This bill does not prevent the authorized sharing of data, but if data is shared, it must be justified and recorded."[16]

53. The ALPR Act defines an "ALPR system" as "a searchable computerized database resulting from the operation of one or more mobile or fixed cameras combined with computer algorithms to read and convert images of registration plates and the characters they contain into computer-readable data." Cal. Civ. Code § 1798.90.5(a).

54. The ALPR Act requires ALPR operators, defined as "a person that operates an ALPR system," and ALPR end-users, defined as "a person that accesses or uses an ALPR system," to draft, adopt, and adhere to written policies governing the collection, use, and sharing of ALPR information. *See* Cal. Civ. Code §§ 1798.90.5(a), 1798.90.5(c), 1798.90.51(b), 1798.90.52, 1798.90.53(b). Importantly, the ALPR Act demands ALPR operators and end-users must "implement a usage and privacy policy to ensure that the collection, use, maintenance, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." Cal. Civ. Code §§ 1798.90.51(b), 1798.90.53(b). To not violate an individual's right to know, the statute commands that ALPR operators' and end-users' privacy policies include all of the following:

> (A) The authorized purposes for accessing and using ALPR information;
>
> (B) A description of the job title or other designation of the employees and independent contractors who are authorized to access and use ALPR information, including identifying the training requirements necessary for those authorized employees and independent contractors;
>
> (C) A description of how the ALPR system will be monitored to ensure the security of the information accessed or used, and compliance with all applicable privacy laws and a process for periodic system audits;
>
> (D) The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons;
>
> (E) The title of the official custodian, or owner, of the ALPR information responsible for implementing this section;
>
> (F) A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors; and

[16] *Id.*

(G) The length of time ALPR information will be retained, and the process the ALPR end-user will utilize to determine if and when to destroy retained ALPR information.[17]

55. ALPR operators must also comply with two additional requirements under Cal. Civ. Code § 1798.90.52:

- *The Audit Requirement:* ALPR operators must maintain a record of each time the ALPR system is accessed, including the date and time, data queried, identity of the querying party, and purpose of the query. (§ 1798.90.52(a).)
- *The Proper Use Requirement:* ALPR operators must require that ALPR information only be used for the authorized purposes described in the usage and privacy policy. (§ 1798.90.52(b).)

56. Operators and end-users of ALPR technology are required not only to create and adhere to these privacy policies, but also to make these policies publicly available on their websites, conspicuously specifying the authorized purposes for which ALPR information may be accessed or used. *Id.*

57. Thus, requiring ALPR operators and end-users to establish and publicly post a policy governing use and maintenance of this data is a primary focus of the ALPR Act. Through these provisions, the Legislature sought to mitigate the privacy risks created by ALPR systems by ensuring transparency, limiting unauthorized access and use, and regulating the collection and aggregation of vehicle location data.

58. Plaintiffs allege that the definitions of ALPR operator and ALPR end-user are not mutually exclusive. An entity that participates in operating an ALPR system may also access or use the information generated by that system. Accordingly, Plaintiffs allege that Defendants are subject to the obligations applicable to both operators and end-users based on their respective conduct.

59. These requirements ensure both that ALPR operators and end-users consider and make deliberate decisions on these issues, and that individuals can know when and how their ALPR Vehicle Tracking Data is being collected and used.

[17] Cal. Civ. Code § 1798.90.53.

60. Most importantly, the ALPR Act "grants individuals *the right to know* which entities are collecting their ALPR data and how it is being used and maintained. Collecting and maintaining individuals' ALPR information without implementing and making public the statutorily required policy harms these individuals by violating this right to know."[18]

61. The ALPR Act's private right of action is found at Cal. Civ. Code § 1798.90.54, which provides that any "individual who has been harmed by a violation of this title, including unauthorized access to or use of ALPR information," may bring a civil action against "a person who knowingly caused the harm" and recover: (1) actual damages, but not less than liquidated damages of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and litigation costs; and (4) other preliminary and equitable relief as the court deems appropriate.

## B. FLOCK SURVEILS AMERICAN COMMUNITIES ON A MASSIVE SCALE

### i. *Flock's Automatic License Plate Readers*

62. Flock is one of the largest ALPR purveyors in the country, marketing its products to a diverse range of public and private entity clients, including retail stores, hospitals, places of worship, residential HOAs, law enforcement agencies, and many more.[19] On its website, Flock represents that its products are used by over 5,000 law enforcement agencies, over 6,000 communities, and over 1,000 businesses.[20]

63. Flock ALPRs are computer-controlled cameras that automatically capture, identify, and record all vehicles that come into their view.[21] Because Flock ALPRs are solar-powered and able to connect to Flock's computer network through cellular data, they can be mounted almost anywhere, including on building exteriors, signposts, light poles, or even moving vehicles. As Flock advertises, customers can "Deploy [its ALPRs] Anywhere."[22]

---

[18] *Bartholomew v. Parking Concepts, Inc.*, 118 Cal. App. 5th 438, 449 (2026).

[19] *Flock Safety*, FLOCK, https://www.flocksafety.com/ (last accessed Aug, 20, 2025) (listing "Industries" that use Flock's products).

[20] *License Plate Readers*, FLOCK, https://www.flocksafety.com/products/license-plate-readers (last accessed Aug. 20, 2025).

[21] *Id.*

[22] *Id.*

64. The primary tool used by Flock ALPRs to identify a given vehicle is Flock's license plate detection software. When a license plate enters the ALPR's field of view, the ALPR automatically captures a photograph of the license plate and transfers it to the Flock Safety Network, where character recognition software automatically converts the image into a license plate number.[23]

65. Flock also employs additional vehicle identification methods beyond license plate detection. For example, through its *Vehicle Fingerprint* software, Flock ALPRs are also able to register a range of vehicle characteristics such as make, model, color, and even unique features like bumper stickers to further ensure accurate identification of a given vehicle.[24]

66. Flock claims that its ALPRs can accurately capture vehicles traveling at up to 100 miles per hour, at distances of up to 75 feet, regardless of lighting.[25] Consequently, through a combination of precise imaging and powerful, multivariable vehicle identification software, Flock ALPRs are able to identify almost every vehicle that they see.

***ii. Flock's Mass Surveillance Apparatus.***

67. Private entities like Defendant can lease Flock's ALPRs to track vehicles traveling through or near their premises. After being installed, the Flock ALPRs automatically detect, identify, and create a record of every vehicle that enters their field of view.[26] These records include not only a picture of the vehicle but also a wide range of automatically generated identification information, defined herein as Vehicle Tracking Data, including the vehicle's license plate number, make, model, body, state of registration, the date and time it was recorded, the location of the ALPR, and a list of other records of the same vehicle.[27]

68. Once recorded by the Flock ALPRs, these vehicle records, including the Vehicle Tracking Data, are then added to the Flock Safety Network, which combines records from other Flock

---

[23] *Id.*
[24] *Id*; *Flock Safety: Eroding Your Privacy & Keeping You Safe with Surveillance*, REDACT (May 15, 2025), https://redact.dev/blog/flock-safety-lpr-privacy-surveillance/ (last accessed Aug. 20, 2025).
[25] Andy East, *Columbus Police Department Got Your Number*, COLUMBUS REPUBLIC (Jan. 23, 2022), at A1.
[26] *Id.*
[27] Reproduced from: Sarah Holder and Fola Akinnibi, *Suburbs of Surveillance*, BLOOMBERG (Aug. 4, 2021), https://www.bloomberg.com/news/features/2021-08-04/surveillance-startup-brings-police-tech-to-neighborhoods (last accessed Aug. 20, 2025).

ALPRs' continuous recordings, including the vehicles captured by at least 80,000 ALPRs nationwide. Ultimately, this system of compiling license plate and vehicle information data allows Flock to create a continuous record of a vehicle's movement through areas where Flock ALPRs are present.

69. Flock's customers can access this vast surveillance database. Indeed, Flock has admitted that all of the information collected by its ALPRs is accessible through the Flock Safety Network. As Flock stated in marketing directed at law enforcement agencies, when its network held roughly one twentieth of the monthly volume it reports today:

> If you know the specific license plate in question, use FlockOS to get a detailed report of the suspect vehicle's history over a given timeframe. Use FlockOS's local and national search network to find the suspect vehicle across state lines, including up to 1 billion monthly plate reads. All this is included, for FREE, for any Flock Safety customer.[28]

70. Moreover, through its *Convoy Analysis* feature, Flock also allows users to identify vehicles that are often seen together. As a result, Flock not only tracks where individuals go, but also who they meet.[29]

71. While Flock customers can opt-out of sharing ALPR information with Flock, individuals do not have that option, and Flock heavily encourages its customers to provide their records, including by conditioning access to other features on granting access to ALPR data. Indeed, customers like Defendant who, upon information and belief, share ALPR information with Flock, are able to benefit from its mass surveillance apparatus. For example, through Flock's *Hot List* feature, Flock customers that share their ALPR information can get alerts when a vehicle on the Federal Bureau of Investigation's National Crime Information Center ("NCIC") list is detected in their area,

---

[28] *See Fast-Growing Company Flock is Building a New AI-Driven Mass-Surveillance System*, ACLU (Mar. 1, 2022), *available online at: https://www.aclu.org/publications/fast-growing-company-flock-building-new-ai-driven-mass-surveillance-system* (last accessed Aug. 20, 2025).

[29] Ben Miller, *Flock Safety Gives Users Expanded Vehicle Location Abilities*, GOVTECH (Sep. 1, 2021), https://www.govtech.com/biz/flock-safety-gives-users-expanded-vehicle-location-abilities (last accessed Aug. 20, 2025).

even if it is detected by another Flock customer's ALPR.[30]

72. Thus, Flock customers, like Defendant, make a conscious, self-interested choice to participate in Flock's mass surveillance apparatus in exchange for benefiting from information collected by other members of that apparatus. Accordingly, by posting Flock ALPRs on their property and sharing the information captured by those ALPRs with Flock, Defendant chose to provide a record of *each and every* driver that traveled within the vicinity of the ALPRs for use in a mass surveillance enterprise. In exchange, Defendant benefits through receiving the inherently valuable Vehicle Tracking Data collected by ALPRs on other Flock customers' properties.

***iii. Flock's Mass Surveillance is a Privacy Nightmare.***

73. Flock's mass surveillance operates on a massive scale, made possible only by the thousands of entities like Defendants that are willing to install Flock's ALPRs on their properties. According to public reporting, there are ***at least 80,000*** active Flock ALPRs surreptitiously tracking Americans across the United States. Through this massive camera network, Flock represents that it collects *20-billion* individual records per month.[31]

74. Flock's ALPRs are designed to be relatively small and not visually prominent, nor do they advertise their function, as shown in Figures 2 and 3 following this paragraph.[32] Thus, absent a publicly posted notice regarding an operator's or end-user's ALPR usage and privacy policy, individuals tracked by Flock's ALPRs have no way of knowing the function of the devices, nor the extent to which their movements are being tracked.

---

[30] Chad Marlow and Jay Stanley, *How to Pump the Brakes on Your Police Department's Use of Flock's Mass Surveillance License Plate Readers*, ACLU (Feb. 13, 2023), https://www.aclu.org/news/privacy-technology/how-to-pump-the-brakes-on-your-police-departments-use-of-flocks-mass-surveillance-license-plate-readers (last accessed Aug. 20, 2025).

[31] *National LPR Network*, FLOCK, https://www.flocksafety.com/products/national-lpr-network (last accessed Aug. 20, 2025).

[32] Figure 3: *The Oaklandside*, "What are Flock cameras, and why are they controversial in Oakland?" https://oaklandside.org/2025/11/20/flock-safety-cameras-oakland-license-plate-readers/ (last accessed March 9, 2026). Figure 4: *KPBS News*, "San Diego County police agencies access many private license plate readers with minimal oversight," https://www.kpbs.org/news/public-safety/2025/11/20/san-diego-county-police-agencies-access-many-private-license-plate-readers-with-minimal-oversight (last accessed March 9, 2026).





*Figures 2 & 3. Flock ALPRs.*

75. Flock does not provide a public directory of its ALPR locations to aid individuals who may want to avoid its mass surveillance. On the contrary, Flock actively tries to hinder the general public from learning of its widespread tracking through the use of cease-and-desist letters to people who try to catalog the locations of their ALPRs.

76. Additionally, in certain areas it is extremely difficult, if not impossible, to entirely avoid having one's Vehicle Tracking Data captured by a Flock ALPR, even when just driving on public roads and never interacting with a Flock customer. Indeed, Flock's vast network of ALPRs monitor not just a customer's private property, but also the public roads adjacent to those properties. This means that even if you do not interact with a specific Flock customer, or even enter that customer's property, in some areas private citizens are unable to avoid having their movements

tracked and loaded into the Flock Safety Network. This means that, in some places, it is not even theoretically possible for someone to "opt out" of tracking.

77. As would be expected, this massive, surreptitious surveillance of private citizens has led to repeated abuses, for example:

a. A police chief and an officer (in different departments) in Kansas used Flock to stalk their ex-romantic partners;[33]

b. A Texas sheriff searched 6,809 different Flock camera networks to identify a woman who had an abortion, including unlawfully accessing video records from states in which abortion is protected;[34]

c. A U.S. Customs and Border Protection's vendor was hacked and license plate images of thousands of travelers at border crossings became available on the dark web;[35] and

d. The U.S. Cybersecurity and Infrastructure Security Agency issued an alert after discovering a "low attack complexity" vulnerability in ALPRs sold by Motorola Solutions, one of the biggest players in the industry.[36]

78. Yet, despite vigorous criticism from a multitude of reputable organizations,[37] Flock's surveillance apparatus is only growing more invasive.

79. No longer satisfied with meticulously tracking vehicles, Flock has turned its attention toward granular surveillance of individuals with its new *Flock Freeform* tool. As shown in the

---

[33] *See* Michel Stavola, *Kansas police chief used Flock license plate cameras 164 times to track ex-girlfriend*, THE WICHITA EAGLE (Aug. 17, 2024), *available online at:* www.kansas.com/news/politics-government/article291059560.html (last accessed Aug. 20, 2025).

[34] *See* Rindala Alajaji, *She Got an Abortion. So A Texas Cop Used 83,000 Cameras to Track Her Down*, ELECTRONIC FRONTIER FOUNDATION (MAY 30, 2025), https://www.eff.org/deeplinks/2025/05/she-got-abortion-so-texas-cop-used-83000-cameras-track-her-down (last accessed Aug. 20, 2025).

[35] *See* Drew Harwell and Geoffrey A. Fowler, *U.S. Customs and Border Protection says photos of travelers were taken in a data breach*, THE WASHINGTON POST (June 10, 2019) www.washingtonpost.com/technology/2019/06/10/us-customs-border-protection-says-photos-travelers-into-out-country-were-recently-taken-data-breach/ (last accessed Aug. 20, 2025).

[36] *See Motorola Solutions Vigilant License Plate Readers*, CISA (June 13, 2024), *available online* at: https://www.cisa.gov/news-events/ics-advisories/icsa-24-165-19 (last accessed Aug. 20, 2025).

[37] *See, e.g.*, Sarah Hamid and Rindala Alajaji, *Flock Safety's Feature Updates Cannot Make Automated License Plate Readers Safe*, ELECTRONIC FRONTIER FOUNDATION (June 27, 2025), https://www.eff.org/deeplinks/2025/06/flock-safetys-feature-updates-cannot-make-automated-license-plate-readers-safe (last accessed Aug. 20, 2025); Jay Stanley, *Fast-Growing Company Flock is Building a New AI-Driven Mass-Surveillance System*, ACLU (March 3, 2022), *available online at*: https://www.aclu.org/wp-content/uploads/publications/flock_1.pdf (last accessed Aug. 20, 2025).

following image ("Figure 4"),[38] *Flock Freeform* allows users to describe a target individual in natural language and review corresponding results from across Flock's ALPR network of at least 80,000 cameras.




*Figure 4. Demonstration of Flock Freeform tool from Flock website.*

80. Thus, if companies like Defendants continue choosing to sacrifice their communities' privacy to gain access to the Flock Safety Network, more and more Americans will find themselves unable to escape perpetual surveillance by private, for-profit companies and those companies' customers.

**C. Lowe's Enterprise ALPR Surveillance Network**

81. Lowe's Companies, Inc. and its operating subsidiary Lowe's Home Centers, LLC together constitute the world's second-largest home improvement retailer. As of July 2026, Lowe's operates approximately 1,759 retail stores across the United States. California is one of Lowe's largest state markets, with 112 stores. For fiscal year 2025 (ended January 30, 2026), Lowe's Companies, Inc. reported total net sales of approximately $83.7 billion.[39]

82. Lowe's entered into an enterprise vendor relationship with Flock Safety for the deployment of ALPR cameras across its store portfolio, including at its California locations. Public

[38] Reproduced from: *Flock Freeform*, FLOCK, https://www.flocksafety.com/products/flock-freeform (last accessed Aug. 20, 2025).

[39] Lowe's Companies, Inc. 10-K for fiscal year ended Jan. 30, 2026; Lowe's Store Directory – California, lowes.com (last visited July 7, 2026).

records obtained by the Electronic Frontier Foundation from the Johnson County, Texas Sheriff's Office, published by 404 Media on August 5, 2025, confirmed that the Sheriff's Office has access to tap into "Flock cameras at 173 different Lowe's locations around the U.S." The same Flock national network architecture that connects Lowe's stores to law enforcement agencies in other states runs identically at Lowe's California locations.

83. The KPBS investigative report on San Diego County ALPR networks (November 20, 2025) independently confirmed that Lowe's is among the private businesses in California that "give police access to their license plate readers," and that these "private systems effectively serve as a wide-ranging extension of law enforcement's surveillance apparatus, even though the private businesses are not subject to the same public scrutiny and transparency requirements." KPBS reported that Lowe's policy "states the company 'may use' ALPRs, but doesn't specify which store locations," that Lowe's "acknowledges that it may share data with law enforcement," and that the policy "does not state that certain law enforcement departments can search its ALPR databases whenever they want." KPBS reported that "Home Depot's policy is very similar."[40]

84. Flock markets its ALPR product as a "digital neighborhood watch" and "end-to-end safety-as-a-service" solution. Flock's national network collects more than 20 billion license plate reads per month.[41] Flock's database is searchable across thousands of networks simultaneously: in documented Flock audit records, law enforcement agencies have searched as many as 6,511 networks[42] and tens of thousands of devices in a single query. Lowe's affirmative decision to connect its California ALPR feeds to Flock's national network is a corporate, enterprise-level choice, not a

[40] Scott Rodd & Gustavo Solis, San Diego County Police Agencies Access Many Private License Plate Readers with Minimal Oversight, KPBS (Nov. 20, 2025), kpbs.org/news/public-safety/2025/11/20/san-diego-county-police-agencies-access-many-private-license-plate-readers-with-minimal-oversight (last accessed Oct. 29, 2026).

[41] Dave Maass & Rindala Alajaji, License Plate Surveillance Logs Reveal Racist Policing Against Romani People, EFF (Nov. 3, 2025), eff.org/deeplinks/2025/11; Thomas Brewster, Flock's AI Cameras Are Watching Cars All Over America, FORBES (June 4, 2025).

[42] Dave Maass & Rindala Alajaji, EFF (Nov. 3, 2025), eff.org/deeplinks/2025/11; *Javorsky & Mayor v. Flock Group, Inc.*, No. CGC-26-634334 (Cal. Super. Ct. S.F. Cty. Feb. 26, 2026), Complaint ¶¶ 23–25.

vendor default, that makes every shopper's vehicle data available to hundreds of law enforcement agencies simultaneously, in real time.

85. At each Lowe's California store where Flock cameras are deployed, cameras are mounted at parking lot entrances and exits. Every vehicle is automatically photographed, and its license plate number, make, model, color, timestamp, and precise location are logged into a centralized, searchable database accessible to law enforcement. Lowe's gave law enforcement agencies, including, on information and belief, agencies in each California county where its stores are located, the ability to query the database and receive automated alerts whenever a vehicle on a law enforcement hot list enters a Lowe's store.




*Figure 5: Illustration of a Flock Safety ALPR system capturing vehicle data at a retail parking lot entrance and uploading it to a centralized, law-enforcement-accessible national database.*

86. Defendants installed Flock's ALPRs on most, if not all of, their properties throughout California. As a result, Plaintiffs and Class Members were tracked by the ALPRs, which transmitted their Vehicle Tracking Data, including pictures of their vehicles, their likeness, other automatically generated information relating to their vehicles, the identities of their associates, and their location to Flock, where it was then catalogued in Flock's voluminous vehicle tracking records across the Flock Safety Network.

87. Defendants failed to publicly provide the proper statutorily required notice to Plaintiffs and Class Members, via their website, that when they visited Defendants' locations, or even just drove near their locations, Defendants would record their Vehicle Tracking Data, including location, images, and individualized vehicle information, and transmit that data to Flock for consolidation with any other Vehicle Tracking Data records pertaining to Plaintiffs and Class Members gathered from at least 80,000 other Flock ALPRs installed across the United States.

88. Defendants' unauthorized and illegal recording of Plaintiffs' and Class Members' Vehicle Tracking Data, without proper public notice, includes not only a snapshot of their vehicles, but also a wide range of automatically generated identification information, including the vehicle's license plate number, make, model, body, state of registration, the date and time it was recorded, and a list of other records of the same vehicle.

89. Upon information and belief, the enterprise ALPR program is not operated independently of Lowe's business operations. Defendants participate in establishing the purposes of surveillance, selecting locations for deployment, determining authorized uses of the information collected, and establishing policies governing the systems. Defendants' involvement in these functions constitutes operational participation rather than passive receipt of services from Flock.

90. Upon information and belief, the relationship between Defendants and Flock includes an allocation of responsibilities concerning camera deployment, system administration, access permissions, retention settings, and information sharing. Plaintiffs allege that Defendants retain authority over material decisions concerning the operation and use of the ALPR systems, notwithstanding Flock's provision of the cameras, software, hosting infrastructure, and related technical services.

91. The placement and operation of the cameras at Lowe's store entrances serve Defendants' own commercial security and loss prevention objectives. Plaintiffs allege that Defendants authorized these deployments and participate in determining the manner in which the systems are used to identify vehicles, generate alerts, and support security investigations.

92. Plaintiffs' and Class Members' movements and information were illegally recorded by Defendants, combined with other information gathered across other Flock ALPRs, and then stored

in the Flock Safety Network where each record pertaining to a given individual or vehicle could be related to all others, thus creating a continuous record of Plaintiffs' and Class Members' movement through areas where Flock ALPRs are present.

93. As such, each time Plaintiffs and Class Members visited Defendants' establishments since Defendants' installation of Flock ALPRs, Plaintiffs and Class Members were unaware that their Vehicle Tracking Data, including their location, movements, and vehicle information, was being tracked, recorded, and shared by Defendants with unauthorized parties.

94. Plaintiffs and Class Members never authorized Defendant to collect or disclose any information about them, including ALPR-collected information subject to the California ALPR Law.

### D. Defendants Actively Accessed and Used ALPR Information as End-Users of Flock's System

95. Defendants' liability under the ALPR Act is not limited to their role as operators of the Flock ALPR cameras installed on Lowe's properties. Defendant also independently violated the ALPR Act as "ALPR end-users" — that is, as persons who "access or use" the ALPR information collected by Flock's system. Cal. Civ. Code § 1798.90.5(a).

96. Upon information and belief, Defendants' subscription to Flock's ALPR service included access to the Flock Safety Network's web-based dashboard and associated query tools. Through this platform, Defendants' employees and agents were able to: (i) search for and retrieve detailed Vehicle Tracking Data records associated with specific license plates or vehicle descriptions; (ii) receive real-time Hot List alerts when vehicles on the FBI's NCIC database were detected anywhere within the Flock Safety Network; (iii) use Flock's Convoy Analysis feature to identify vehicles that traveled together, thereby enabling Defendant to reconstruct the associations and movements of Plaintiffs and Class Members beyond what could be observed at any single point; and (iv) access vehicle records generated not only by Defendants' own cameras but by any of the 80,000+ Flock ALPRs nationwide whose data is accessible through the Flock Safety Network.[43]

---

[43] Flock's standard commercial platform provides all paying customers with access to the Flock Safety Network. *See* National LPR Network, FLOCK SAFETY, https://www.flocksafety.com/products/national-lpr-network (last accessed July 8, 2026). Access to and use of this system is the defining characteristic of an "ALPR end-user" under Cal. Civ. Code §

97. Each query Defendants ran, each alert they received, and each record they reviewed through the Flock Safety Network constituted a discrete act of "access[ing] or us[ing]" ALPR information within the meaning of Cal. Civ. Code § 1798.90.5(a). Cal. Civ. Code § 1798.90.52(b) requires an ALPR operator to require that ALPR information be used only for the authorized purposes described in the usage and privacy policy that section 1798.90.51(b) requires. Because Defendants implemented no policy containing the information section 1798.90.51(b)(2) makes mandatory, Defendants described no authorized purpose within the meaning of the statute, and each access and use occurred outside any described authorized purpose.

98. As an end-user, Defendants were independently obligated under Cal. Civ. Code § 1798.90.53(a) to "maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure." Defendants did not maintain security procedures and practices adequate to prevent the unauthorized access and disclosure described in this Complaint, and Defendants disclose no contractual or operational safeguard restricting access to ALPR information held on their vendor's platform.

99. Defendants' roles as ALPR end-users is independent of, and survives regardless of, their liability as ALPR operators. Even if the Court were to find that Defendants' installation and hosting of the physical ALPR system does not by itself trigger operator liability, Defendants' affirmative decision to access, query, and benefit from the Flock Safety Network independently triggers ALPR end-user liability under § 1798.90.53(b)(1).

**E. Defendants Were Enriched by Their Contribution to the Mass Surveillance of Plaintiffs and Class Members**

100. As explained, *supra*, users of Flock ALPRs receive access to inherently valuable Vehicle Tracking Data from other Flock customers' ALPRs in exchange for sharing their own information to the Flock Safety Network.

101. Upon information and belief, Defendants made a conscious, self-interested choice to participate in Flock's mass surveillance apparatus in exchange for benefiting from information

---

1798.90.5(a). *See also* ¶¶ 69–74, *supra* (describing Flock's dashboard, Hot List, and Convoy Analysis features available to all paying Flock customers).

collected by other members of that apparatus.

102. Accordingly, by installing Flock ALPRs on their property and sharing the information captured by those ALPRs with Flock, Defendant chose to provide a record of *each and every* driver that traveled within the vicinity of the ALPRs for use in Flock's mass surveillance enterprise in exchange for valuable data collected by ALPRs on other Flock customers' properties.

103. In other words, Defendants were enriched in the form of being granted access to the Flock Safety Network database in exchange for allowing Flock to access the records created by the ALPRs installed on their own property.

**F. Plaintiffs' and Class Members' Reasonable Expectation of Privacy**

104. At all times, Plaintiffs and Class Members had a reasonable expectation Defendant would not track and record their location and movement for use in a massive surveillance apparatus like the one created by Flock and perpetuated by Defendants' participation.

105. Privacy polls consistently show that Americans overwhelmingly consider their location information to be among the most sensitive facets of their life.

106. For example, one poll found that 78 percent of Americans believe that Congress should "strengthen privacy protections for people in the U.S. against warrantless government surveillance of their…location information" (as opposed to 9 percent against).[44] Likewise, in another survey, 88 percent of Americans stated that "not having someone watch you or listen to you without your permission" was important to them, with 72 percent rating it as "very important."[45]

107. Personal privacy and informed consent are material to Plaintiffs and Class Members, as also demonstrated by the California Legislature's requirement in the ALPR Law that any operator or end-user of an ALPR camera or system provide public notice of the same.

---

[44] *YouGov Mass Surveillance Debate Polling*, DEMAND PROGRESS EDUCATION FUND (Dec. 14, 2023), https://demandprogresseducationfund.org/new-polling-as-mass-surveillance-debate-reaches-final-stages-in-congress-americans-demonstrate-overwhelming-support-for-increased-privacy-protections/ (last accessed Aug. 20, 2025).

[45] Mary Madden and Lee Rainie, Americans' Attitudes About Privacy, Security and Surveillance, PEW RESEARCH CENTER (May 20, 2015), https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/ (last accessed Aug. 20, 2025).

**G. Plaintiffs' ALPR Data Has Economic Value**

108. Every day, commercial entities purchase data about individuals, including location history, from data brokers and other sources to run targeted advertisements and tailor services. The data Flock captures, including license plate numbers, vehicle characteristics, precise timestamps, and GPS-tagged location information, is precisely the kind of commercially valuable data that data brokers seek, aggregate, and sell.

109. ALPR data, when aggregated and fused with data from other sources, reveals detailed information about an individual's purchasing decisions, lifestyle, associates, and interests. Flock itself developed its "Nova" product specifically to fuse ALPR data with information from data brokers, credit reporting agencies, and other external sources, including, according to reporting by 404 Media, stolen personal information from data breaches found on the dark web, to generate richer profiles of individuals and their vehicles. This commercial fusion function confirms that the data captured at Lowe's California stores has measurable economic value to Plaintiffs and class members.

110. The economic value of Plaintiffs' ALPR data, and each class member's interest in controlling the dissemination of that data, has been diminished by Lowe's failure to implement a fully compliant ALPR usage and privacy policy, its unrestricted sharing of that data with law enforcement, and its failure to prevent its vendor from secretly re-enabling nationwide data access. Plaintiffs' data was taken from them without the disclosures California law requires, and without the restrictions on use that a compliant policy would have imposed.

111. Plaintiffs attribute economic value to the vehicle and location data Defendants collected, and each Plaintiff would have participated in the market for that data had Defendants disclosed that they were collecting and retaining it. No Plaintiff received, or agreed to forgo, any consideration in exchange for Defendants' collection and retention of that data.

**H. Lowe's ALPR Policy Fails to Satisfy California Law**

112. Lowe's publishes ALPR-related disclosures within its general U.S. Privacy Statement rather than through a separately identified ALPR policy page. Plaintiffs do not contend that the ALPR Act categorically requires a standalone webpage. Rather, Plaintiffs allege that the placement and presentation of Lowe's disclosures, considered together with their substantive deficiencies, fail to

satisfy the requirements that operators and end-users implement and conspicuously make available usage and privacy policies containing the information specified by statute. Cal. Civ. Code §§ 1798.90.51(b)(1) and 1798.90.53(b)(1). Instead, Lowe's ALPR provisions are embedded within its general "U.S. Privacy Statement" as a subsection, effective January 10, 2024. A policy embedded within a general privacy statement, rather than a standalone ALPR-specific usage and privacy policy conspicuously posted on the website, does not satisfy the Act's requirement that the operator "implement a usage and privacy policy" for ALPR information as a distinct, identifiable document providing California shoppers with the "right to know" that the *Bartholomew* court identified as the Act's core protected interest. (*Bartholomew v. Parking Concepts, Inc.* (2026) No. A171546, slip op. at 9–10 (Cal. Ct. App. 1st Dist. Feb. 5, 2026), as mod. Feb. 27, 2026.).

113. The ALPR section within Lowe's U.S. Privacy Statement states, in its entirety:

> At some of our stores, and when allowed by law, we use cameras with automated license plate reader ("ALPR") technology near and around parking areas. These systems use cameras to automatically capture images of **vehicles** and their **license plates**, along with the **date**, **time**, and **general location**. We use this technology for limited, authorized purposes. Personal Information is collected through ALPRs to help ensure security, prevent theft and fraud, assist with parking enforcement, and to help maintain your safety and the safety of individuals and our properties.
>
> **Associate and Independent Contractor Access**
> Trained Asset Protection associates, information security staff, and select service providers who maintain or improve the system may use or access ALPR data. Each person must complete Lowe's ALPR training before gaining access and must renew that training every year.
>
> **Sharing with Law Enforcement**
> We only disclose your personal information if required by law or legal process, or when we believe doing so will help protect the safety, property, or rights of individuals or Lowe's. Examples include:
>
> - Protecting the health or safety of individuals.
> - Addressing crimes committed on Lowe's property.
> - Identifying and addressing fraud or financial risk.
> - Responding to a request from state or local law enforcement.
> - A search warrant, other judicial order, or valid legal process.
> - Assist with fraud prevention and potential criminal activity.
>
> **Sale and Sharing with Others**
> We do not sell ALPR information and we only share it with select service providers who help us maintain the technology and the National Center for Missing and Exploited Children.

> **How We Keep the Data Secure**
> Our ALPR systems are monitored by our Asset Protection team to ensure data is handled properly and lawfully. Access is role-based and audited, and system activity is regularly reviewed to confirm proper use. We also validate system accuracy and performance at least monthly to make sure the data remains reliable.
>
> **Oversight and Custodianship**
> Lowe's Vice President of Asset Protection is the official custodian responsible for overseeing Lowe's ALPR systems, ensuring compliance with this policy, and coordinating with our Legal Team for periodic reviews.
>
> **Data Accuracy and Correction**
> We take reasonable steps to ensure that ALPR data is accurate and current. ALPR matches are always verified with additional evidence (such as security camera footage) before being used in any investigation. If data errors are identified, they are corrected or removed promptly.
>
> **Data Retention**
> Lowe's retains ALPR data only as long as necessary for the reasons described above — typically no more than 90 days (though shorter in certain states), unless it's needed for an active investigation or to comply with a legal obligation. After that, the data is permanently deleted.

114. Lowe's decision to publish an ALPR provision does not insulate it from liability. A policy that omits mandatory elements is not a compliant policy. The California ALPR Act requires that operators "implement a usage and privacy policy" that "include[s], at a minimum" each of the seven specific elements enumerated at Cal. Civ. Code § 1798.90.51(b)(2)(A)–(G). (*See* Cal. Civ. Code § 1798.90.51(b)(2) (policy "shall include, at a minimum" each listed element).) The February 27, 2026, modification order in *Bartholomew v. Parking Concepts, Inc.*, No. A171546 (Cal. Ct. App. 1st Dist.), expressly declined to decide "whether collecting and maintaining ALPR information with a usage and privacy policy that does not include every component identified in section 1798.90.51, subdivision (b)(2) would also cause such harm" confirming that Plaintiffs' theory is legally viable and unresolved in Defendants' favor.

115. Plaintiffs acknowledge that Lowe's published ALPR provisions address several subjects enumerated in the ALPR Act, including categories of authorized personnel, training, monitoring, accuracy, retention, and certain disclosures to third parties. Plaintiffs do not allege that the mere absence of a standalone ALPR webpage establishes noncompliance or that the statute

requires the identification of every law-enforcement agency that might access ALPR information. Plaintiffs instead challenge whether the published provisions adequately describe the actual purposes, processes, and restrictions governing third-party sharing; the monitoring and auditing of access through the vendor-managed system; and the retention and destruction practices applicable to information maintained or disclosed through that system. Lowe's ALPR policy fails to comply with the ALPR Act in at least the following material respects:

- **Overbroad and Unrestricted Law Enforcement Sharing Clause (§ 1798.90.51(b)(2)(D)).** The statute requires disclosure of "the purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information." Lowe's policy states that it discloses personal information "if required by law or legal process, or when we believe doing so will help protect the safety, property, or rights of individuals or Lowe's," and lists among its examples "[r]esponding to a request from state or local law enforcement." This catch-all category is so expansive it constitutes no meaningful restriction whatsoever on law enforcement access. It authorizes sharing for undefined "legal obligations" and "other requirements" without limiting the category of recipients to California agencies, without restricting sharing with out-of-state agencies, federal agencies, immigration enforcement agencies, or agencies not in the jurisdiction of the specific store where data was collected. The California Attorney General has expressly condemned unrestricted out-of-state data sharing as a violation of the ALPR Act. While Lowe's separately states it shares data with law enforcement "upon an appropriate request, solely in connection with criminal investigations," the open-ended third clause effectively swallows that restriction and creates an independent, unrestricted pathway for law enforcement sharing. Plaintiffs allege that this does not adequately describe how law-enforcement access occurs through its Flock deployment, whether access is granted through direct requests or network permissions, what restrictions govern searches by persons outside Lowe's organization, or how Defendants determine whether a particular access or transfer is authorized. These omissions are material because the manner in which

access is granted and restricted determines the extent to which information collected at Lowe's California stores may become available to third parties.

- **Insufficient Training Requirements (§ 1798.90.51(b)(2)(B)).** The statute requires "a description of the job title or other designation of the employees and independent contractors who are authorized to use or access the ALPR system" and identification of "the training requirements necessary for those authorized employees and independent contractors." Lowe's policy identifies categories of personnel authorized to access ALPR information and refers to training. Plaintiffs allege that it does not adequately describe the training requirements applicable to those personnel, particularly concerning the permitted purposes of access, restrictions on sharing, vendor-managed access, and compliance with California's ALPR-specific requirements. Plaintiffs challenge the sufficiency of the description rather than asserting that the policy contains no reference to training.
- **Inadequate Monitoring Description (§ 1798.90.51(b)(2)(C)).** The statute requires "a description of how the ALPR system will be monitored to ensure the security of the information and compliance with applicable privacy laws." Lowe's policy states that its Asset Protection team monitors ALPR systems and that access is audited and reviewed. Plaintiffs allege that these statements do not adequately describe how Defendants monitor access through Flock's network, review third-party queries, identify improper searches, or conduct periodic audits to ensure compliance with applicable privacy requirements. Plaintiffs further allege that these deficiencies are significant because vendor-managed access can occur outside Defendants' immediate workforce.
- **Insufficient Accuracy Measures (§ 1798.90.51(b)(2)(F)).** The statute requires "a description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors." Lowe's policy states that it takes "reasonable steps to ensure that ALPR data is accurate and current" and that "ALPR matches are always verified with additional evidence." Plaintiffs allege that verification of a match before Lowe's acts on it is not a measure to ensure accuracy or correct data errors within the meaning of the subdivision. The policy describes no process for correcting a record

Lowe's has already shared with a law enforcement agency, no means by which a driver whose plate the system misread may learn that it happened, and no responsible role or frequency for any accuracy review. Plaintiffs allege that the policy does not adequately describe how erroneous ALPR records are corrected within the vendor-managed system, whether corrections are reflected in information previously made available to third parties, or what procedures prevent known inaccuracies from continuing to generate erroneous results.

- **<u>Failure to Conspicuously Make Available a Compliant Usage and Privacy Policy.</u>** The ALPR Act requires an operator to "implement a usage and privacy policy" and to post it "conspicuously" on the website. (Cal. Civ. Code § 1798.90.51(b)(1).) Plaintiffs allege that Lowe's ALPR provisions were embedded within a broader consumer privacy statement and were not presented in a manner reasonably calculated to make the required ALPR policy readily discoverable by persons seeking information about the company's use of ALPR technology. Plaintiffs further allege that the policy's placement, combined with its substantive deficiencies, deprived them of material information required by the ALPR Act. Embedding ALPR provisions within a multi-page general privacy statement, without a separate ALPR policy link, without conspicuous ALPR-specific signage, without any mechanism for a California shopper to locate the ALPR policy without reading through a comprehensive general privacy statement, does not satisfy this mandate. A policy buried in subsection form within a general privacy statement is not "conspicuously" posted as California's ALPR Act requires.
- **<u>Failure to Specify Retention Period and Destruction Method — § 1798.90.51(b)(2)(G)</u>**. The statute requires the usage and privacy policy to specify "the length of time ALPR information will be retained and the manner in which it will be destroyed." Cal. Civ. Code § 1798.90.51(b)(2)(G). Lowe's policy states that ALPR information is retained only as long as necessary and typically for no more than 90 days, subject to exceptions. Plaintiffs acknowledge that the policy identifies a typical retention period. Plaintiffs allege, however, that it does not adequately describe the process for

determining when retained information will be destroyed, the circumstances governing retention beyond the typical period, or how those practices apply to information maintained through Flock or disclosed to other persons. Lowe's ALPR provisions contain a vague and nondefinitive retention period. Lowe's does not state that Vehicle Tracking Data will be retained for a fixed number of days, weeks, or months. Lowe's describes no process by which ALPR data will be deleted or destroyed at the end of any defined period. The absence of a definitive retention period leaves every class member's Vehicle Tracking Data available indefinitely in Flock's national database, searchable by law enforcement at any time and for any purpose, without any temporal limit Lowe's has committed to enforce. The retention period is one of seven specific mandatory elements the California Legislature enumerated, reflecting its considered judgment that California residents have a right to know how long their movements will be tracked and stored. Lowe's has provided no answer.

116. In addition to its ALPR-specific policy deficiencies, Lowe's general Privacy Statement, which its ALPR policy incorporates by reference, confirms that Lowe's collects "license plate information when permitted in certain states" as part of "audio, electronic, video or image information." The general privacy policy's data-sharing provisions are broader than the ALPR-specific subsection, authorizing disclosure to law enforcement "as we deem appropriate or necessary in response to requests by government agencies, such as law enforcement authorities or tax authorities." This general policy imposes no ALPR-specific restrictions whatsoever and does not satisfy the ALPR Act's specific, granular policy requirements.

**Automated License Plate Recognition**

At some of our stores, and when allowed by law, we use cameras with automated license plate reader ("ALPR") technology near and around parking areas. These systems use cameras to automatically capture images of **vehicles** and their **license plates**, along with the **date**, **time**, and **general location**. We use this technology for limited, authorized purposes. Personal Information is collected through ALPRs to help ensure security, prevent theft and fraud, assist with parking enforcement, and to help maintain your safety and the safety of individuals and our properties.

**Associate and Independent Contractor Access**

Trained Asset Protection associates, information security staff, and select service providers who maintain or improve the system may use or access ALPR data. Each person must complete Lowe's ALPR training before gaining access and must renew that training every year.

**Sharing with Law Enforcement**

We only disclose your personal information if required by law or legal process, or when we believe doing so will help protect the safety, property, or rights of individuals or Lowe's. Examples include:

- Protecting the health or safety of individuals.
- Addressing crimes committed on Lowe's property.
- Identifying and addressing fraud or financial risk.
- Responding to a request from state or local law enforcement.
- A search warrant, other judicial order, or valid legal process.
- Assist with fraud prevention and potential criminal activity.

**Sale and Sharing with Others**

We do not sell ALPR information and we only share it with select service providers who help us maintain the technology and the National Center for Missing and Exploited Children.

**How We Keep the Data Secure**

Our ALPR systems are monitored by our Asset Protection team to ensure data is handled properly and lawfully. Access is role-based and audited, and system activity is regularly reviewed to confirm proper use. We also validate system accuracy and performance at least monthly to make sure the data remains reliable.

**Oversight and Custodianship**

Lowe's Vice President of Asset Protection is the official custodian responsible for overseeing Lowe's ALPR systems, ensuring compliance with this policy, and coordinating with our Legal Team for periodic reviews.

**Data Accuracy and Correction**

We take reasonable steps to ensure that ALPR data is accurate and current. ALPR matches are always verified with additional evidence (such as security camera footage) before being used in any investigation. If data errors are identified, they are corrected or removed promptly.

**Data Retention**

Lowe's retains ALPR data only as long as necessary for the reasons described above — typically no more than 90 days (though shorter in certain states), unless it's needed for an active investigation or to comply with a legal obligation. After that, the data is permanently deleted.

*Figure 7: Lowe's ALPR provisions as embedded within its general U.S. Privacy Statement at lowes.com. Rather than a standalone, conspicuously posted ALPR usage and privacy policy, Lowe's ALPR provisions are buried within a general privacy statement and fail to impose meaningful restrictions on out-of-state and federal law enforcement sharing.*

## I. Flock's Pattern of Unauthorized Data Sharing in California - Confirming Lowe's Exposure

117. Multiple confirmed incidents across California, disclosed through mandatory government audits and public records requests in 2025 and 2026, establish that Flock has systematically failed to maintain the access controls it promised its California customers, resulting in California ALPR data being exposed to federal agencies and out-of-state law enforcement without authorization or notice. These incidents demonstrate that the privacy harms from non-compliant ALPR deployments are not theoretical, and that Flock's failure to maintain data access controls is a known, systemic problem that all Flock customers, including Defendants, have been put on notice of.

118. In January 2026, the Mountain View Police Department ("MVPD") disclosed that Flock had secretly set MVPD's first deployed ALPR camera to a "nationwide" sharing setting without MVPD's permission or knowledge. As a result, between August and November 2024, MVPD's ALPR data was accessed by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (offices in Kentucky and Nashville); Langley Air Force Base in Virginia; the U.S. GSA Office of Inspector General; Lake Mead National Recreation Area in Nevada; and an Ohio Air Force Base, none of which were authorized to access MVPD's data. Flock could not determine whether these searches resulted in license plate information being shared because Flock had not retained records for that period. *Katie Debenedetti, As California Cities Grow Wary of Flock Safety Cameras, Mountain View Shuts Its Off,* KQED (Feb. 3, 2026).

119. An audit further revealed that a "statewide" search function, also contrary to the access controls MVPD believed were in place, was enabled on 29 of 30 deployed cameras. Mountain View Police Chief Michael Canfield shut down the entire Flock network, stating: "The existence of access by out-of-state agencies, without the City's awareness, that circumvented the protections we purposefully built and believed were in place is frankly unacceptable to me." The City characterized this as "a system failure on Flock Safety's part."

120. In February 2026, the Ventura County Sheriff's Office disclosed that out-of-state agencies had accessed its Flock ALPR data more than 364,000 times between February and March 2025 without authorization, including 299 searches listing immigration enforcement, explicitly referencing ICE, as the justification.[46]

121. Ventura County had specifically disabled Flock's "National Lookup" feature in June 2023 to comply with California law. Nevertheless, the feature had been secretly re-enabled. Flock told Ventura County it was "impossible to determine the specific cause." The Oxnard Police Department suspended Flock use entirely. These incidents confirm that Flock customers cannot rely on their own contractual access controls to prevent unauthorized data sharing.

---

[46] Matthew Rodriguez, *Flock license plate readers shared data with out-of-state agencies, Ventura County audit finds*, CBS News (Feb. 27, 2026).

122. In June 2026, the San Francisco Police Department ("SFPD"), publicly disclosed that an internal audit of its Flock ALPR network had uncovered improper access by out-of-state and federal agencies. According to the SFPD, its ALPR data had been improperly searched approximately 300 times over roughly a one-year period. SFPD determined that it had authorized the Northern California Regional Intelligence Center ("NCRIC"), a California law-enforcement intelligence-sharing entity, to access its ALPR data, but that NCRIC's access credentials were, in turn, used to run searches on behalf of outside agencies that had no direct, authorized access to SFPD's system – a practice California law prohibits absent a court order or warrant.[47]

123. SFPD's audit further revealed that the improper searches had actually been executed by analysts employed by the Western States Information Network ("WSIN"), a Sacramento-based multi-state law-enforcement intelligence-sharing organization, after NCRIC granted WSIN access to SFPD's ALPR data. SFPD stated that it was, by its own account, the first law enforcement agency to identify this improper-access pattern as a systemic problem, which indicates that the same unauthorized-access architecture responsible for the SFPD breach is present in other Flock-connected networks across the state, including networks maintained by private entities such as Defendants.[48]

124. The SFPD disclosure is consistent with, and corroborates, the pattern of unauthorized and undisclosed data exposure previously documented in Mountain View and Ventura County: in each instance, ALPR data that a California Flock customer believed was subject to defined, limited access controls was instead exposed – through a vendor-side default setting, a misconfiguration, or a downstream sharing arrangement the customer neither authorized nor discovered until an audit was conducted – to out-of-state and federal agencies, including agencies associated with immigration enforcement. As with Mountain View and Ventura County, the SFPD incident demonstrates that neither Flock nor its institutional customers can be relied upon to self-detect unauthorized access, absent an independent audit, and that such exposure can persist undetected for extended periods.

---

[47] Carlos E. Castañeda, *Audit Shows San Francisco Police Flock License Plate Camera Data Accessed by Outside Agencies*, CBS News (June 18, 2026, 12:36 PM PDT), https://www.cbsnews.com/sanfrancisco/news/san-francisco-police-flock-alpr-automated-license-plate-reader-data-access/.
[48] *Id.*

Upon information and belief, Defendants have never conducted, commissioned, or disclosed to Class Members the results of any comparable audit of the Flock ALPR network Defendants operates at Lowe's, and Class Members therefore have no basis to know whether their Vehicle Tracking Data has been, or continues to be, subject to the same unauthorized-access risks documented in San Francisco, Mountain View, and Ventura County.

125. In August 2026, the *Washington Post* published an investigation documenting a related but distinct failure of Flock's access controls: the absence of meaningful safeguards against officers misusing the ALPR network for personal, non-investigative purposes. The Post's analysis of police and court records found that at least 50 law-enforcement officers nationwide have been charged with or accused of using license-plate readers for unauthorized purposes, including to stalk women without their knowledge or consent, with the majority of those cases involving Flock specifically. In 26 of these cases, police investigators and prosecutors said the officers used the technology to spy on their wives, girlfriends, exes, their exes' new partners, or women they wanted to meet.[49]

126. The Post's reporting illustrates the ease of this misuse through the case of a Georgia woman whose police-chief ex-boyfriend ran searches on her license plate and her daughter's roughly 600 times over about a year, tracking her using Flock's ALPR network before he was arrested on stalking-related charges. As the Post's reporting explained, Flock's system allowed this because any officer at a Flock-contracted department could enter a vehicle into a search field, type a generic justification such as "investigation," and be done — nothing in the database itself could distinguish a legitimate criminal inquiry from an unauthorized one. The Post further reported that no federal statute requires officers to obtain a warrant before querying an ALPR database, no federal law mandates that ALPR searches be tied to active investigations, and no federal rule limits how many times an officer may search the same plate or requires that the vehicle owner be notified when a search occurs. [50]

---

[49] Drew Harwell, Douglas MacMillan, and Aaron Schaffer, *How rogue officers turned a nationwide camera network into a tool for stalking*, WASH. POST (Aug. 3, 2026), https://www.washingtonpost.com/technology/2026/08/02/how-police-officers-used-vast-network-cameras-spy-their-exes/ (last accessed Oct. 29, 2026).

[50] *Id.*

127. Notably, Flock's own response to the Post confirms that meaningful audit and access-control safeguards are neither built into the system by default nor mandatory for its customers**.** In April 2026, the company rolled out a new voluntary "audit assistance" feature, which agencies can choose to enable, that automatically scans officers' searches for suspicious activity such as repeated queries targeting the same vehicle or searches run while an officer is off duty. Flock's chief executive told the Post that misuse of its systems is inevitable and that the company's focus is on providing tools to catch perpetrators after the fact rather than preventing misuse. [51]

128. Upon information and belief, Defendants have not enabled, or disclosed to Class Members whether they have enabled, this voluntary audit-assistance feature, or any comparable safeguard, on the Flock ALPR network operated Lowe's locations.

129. Taken together, the Mountain View, Ventura County, and SFPD audits described above, and the Post's nationwide stalking investigation, establish two independent and compounding categories of unauthorized access risk inherent in Flock's ALPR architecture as deployed by Defendant: (i) systemic vendor-side misconfigurations and downstream sharing arrangements that expose customer ALPR data to federal and out-of-state agencies without the customer's knowledge; and (ii) the absence of meaningful, mandatory controls preventing individual officers with network access from misusing that access for personal, non-investigative surveillance, as documented above. Plaintiffs' and Class Members' Vehicle Tracking Data is subject to both categories of risk by virtue of Defendant's participation in the Flock Safety Network.

130. Upon information and belief, Defendants' Flock ALPR configuration Lowe's use the same default or standard sharing settings that Flock has deployed for other California customers. As documented above, Flock's default or misconfigured settings have repeatedly exposed California ALPR data to federal and out-of-state law-enforcement agencies without the knowledge or approval of the local agency customers, including hundreds of thousands of National Lookup searches.

131. As a result, Plaintiffs' and Class Members' Vehicle Tracking Data, captured by Defendants' Flock ALPRs at Lowe's locations and contributed to the Flock Safety Network, has been, and continues to be, accessible to federal and out-of-state law-enforcement agencies beyond

---

[51] *Id.*

any sharing Defendants explicitly authorized, subjecting Class Members to the same systemic risks and unauthorized access patterns revealed by the Mountain View, Ventura County and SFPD audits.

132. Defendants, as California Flock customers, are subject to the same systemic vulnerabilities. As an ALPR operator and an ALPR end-user, Defendants bear the statutory obligation to implement and maintain compliant usage, privacy and security policies and to require that ALPR information be used only for authorized purposes.

133. Plaintiffs' statutory claims do not depend upon proving that a particular law-enforcement agency or other third party actually queried either Plaintiffs' specific ALPR record. The allegations concerning Flock's broader data-sharing practices and documented incidents involving unauthorized access illustrate the concrete importance of the disclosures, access restrictions, security procedures, and accountability mechanisms mandated by California law. Plaintiffs independently suffered the right-to-know harm alleged herein when Defendants collected and maintained their ALPR information without providing the policy and information California law required Defendants to make publicly available.

**J. Lowe's Failure to Comply with California Law**

134. The ALPR Law, codified at Cal. Civ. Code §§ 1798.90.51(a) and 1798.90.53(a), requires Defendants, as operators and end users, to, among other things, "[m]aintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure." *Id.*

135. These reasonable security procedures and practices required Defendant to implement an ALPR usage and privacy policy, "in order to ensure that the access, use, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." Cal. Civ. Code §§ 1798.90.51(b); 1798.90.53(b).

136. Moreover, as specifically set forth, *supra*, Cal. Civ. Code § 1798.90.53's ALPR usage requirements command that ALPR operators and end-users, such as Defendant, "at minimum," must implement and publicly post a privacy policy with regards to their ALPR use that informs the public with regard to Defendant's purposes for accessing and using ALPR information, list the job title and training for individuals who will have access to the ALPR information, inform individuals how long

their ALPR information will be retained, and also describe how the ALPR system will be monitored for compliance with all applicable privacy laws, among other things. See Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G); 1798.90.53(b)(2)(A)-(G).

137. In establishing these specific requirements governing operators and end-users with regard to their ALPR use, the Legislature expressly provided that such requirements enumerated in Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G) and 1798.90.53(b)(2)(A)-(G) constitute the "***minimum***" safeguards necessary to protect individuals' privacy and civil liberties. Accordingly, any failure to comply with or meet these minimum statutory requirements is a violation of the ALPR Law. Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G); 1798.90.53(b)(2)(A)-(G).[52]

138. As of the filing of this Complaint, no Internet Web site operated by Defendants or their affiliates carries a usage and privacy policy containing the information Cal. Civ. Code sections 1798.90.51(b)(2) and 1798.90.53(b)(2) make mandatory, and no such policy is posted conspicuously. The ALPR provisions Defendants do publish appear as a subsection of the general privacy statement attached as **Exhibit A.**

139. Defendant's failure to post a compliant ALPR-specific policy violates Cal. Civ. Code §§ 1798.90.51(b)(1) and 1798.90.53(b)(1), which require every ALPR operator and end-user to "implement a usage and privacy policy" and to post that policy "conspicuously" on its website. Defendant's policy fails to satisfy the seven mandatory elements required by Cal. Civ. Code § 1798.90.51(b)(2)(A)–(G).

140. Lowe's has failed to satisfy the core statutory requirements imposed by the ALPR Act on both ALPR "operators" and "end-users."

141. **Non-Compliant ALPR Policy.** As detailed above, Plaintiffs allege that Lowe's published ALPR provisions do not adequately describe the actual processes and restrictions governing third-party sharing, monitoring of access through the vendor-managed system, correction

---

[52] Although the statutory provisions governing ALPR operators and end users contain minor variations in wording, the substantive requirements imposed by the ALPR Law are materially identical and impose the same core obligations with respect to privacy, security, and data handling. *See* Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G); 1798.90.53(b)(2)(A)-(G). Because the statutory requirements applicable to ALPR operators and end users are materially identical, Plaintiffs' quotes throughout this section cite to § 1798.90.51 for convenience, except where distinctions are relevant.

of inaccurate information, and retention and destruction practices. Although Lowe's policy references training, monitoring, accuracy measures, and a typical retention period, Plaintiffs allege that the disclosures remain deficient in the respects specifically identified above. Plaintiffs further allege that the policy was not conspicuously made available as required by statute. Cal. Civ. Code §§ 1798.90.51(b)(2) and 1798.90.53(b).

142. *Bartholomew* recognized that collecting and maintaining ALPR information without implementing and making public the statutorily required policy can cause actionable harm by depriving individuals of information the Legislature required to be disclosed. Lowe's published disclosures were materially deficient in substance and in conspicuousness, and they deprived Plaintiffs of information the ALPR Act specifically required Defendants to make available. Lowe's policy is, in substance, functionally equivalent to no policy at all: it commits to no definitive retention limit, imposes no meaningful restriction on law enforcement access, and is buried in a general privacy statement rather than conspicuously posted as a standalone ALPR policy. An ALPR policy that tells California shoppers nothing about who is responsible for their data, how long it will be kept, or which law enforcement agencies can access it does not give them the "right to know" the Legislature guaranteed, regardless of whether it is labeled a policy.

143. **No Reasonable Security Procedures.** Lowe's failed to maintain reasonable security procedures as required by Cal. Civ. Code §§ 1798.90.51(a) and 1798.90.53(a). Lowe's connected its California ALPR data to Flock's national law enforcement sharing network without implementing contractual or operational safeguards to prevent Flock from secretly re-enabling nationwide data-sharing settings, a pattern Flock repeatedly demonstrated across California agency installations in 2025 and 2026. Lowe's has not publicly announced the implementation of any safeguards to prevent federal or out-of-state access following the public disclosure of these incidents.

144. **No Adequate Audit Records.** Lowe's ALPR policy states that access is "role-based and audited, and system activity is logged," but it identifies no record of access that Lowe's itself maintains, states no interval at which any record is reviewed, and the records are maintained through Flock rather than independently by Lowe's, and the Mountain View incident demonstrates that Flock itself failed to retain audit records for periods of unauthorized access, making it "impossible to

determine" whether law enforcement searches resulted in license plate information being shared. Lowe's failure to independently maintain comprehensive audit records as required by Cal. Civ. Code § 1798.90.52(a) is a separate statutory violation.

145. **Unauthorized Sharing.** Lowe's permitted its ALPR vendor to feed California ALPR data into a national network accessible to out-of-state and federal agencies without adequate restrictions, conduct the California Attorney General has expressly condemned as a violation of the ALPR Act. (*See* Atty. Gen. Press Release, *Attorney General Bonta Sues El Cajon for Illegally Sharing License Plate Data with Out-of-State Law Enforcement* (Oct. 3, 2025); *Javorsky & Mayor v. Flock Group, Inc.*, No. CGC-26-634334 (Cal. Super. Ct. S.F. Cty. Feb. 26, 2026) (alleging Flock shared San Francisco ALPR data with out-of-state and federal agencies more than 1.6 million times in a seven-month period).

146. **No Adequate Accuracy Measures.** Lowe's failed to implement adequate accuracy measures as part of its ALPR policy. (§ 1798.90.51(b)(2)(F)). Lowe's ALPR policy states only that authorized users will verify "ALPR matches ... with additional evidence", with no defined frequency, no process for correcting data already transmitted to law enforcement, and no mechanism for notifying affected individuals. This is not a description of "reasonable measures" that satisfies the statute.

147. **Lowe's Knowingly Engaged in This Conduct.** Lowe's Companies, Inc. is the world's second-largest home improvement retailer with fiscal year 2025 revenues of approximately $83.7 billion, experienced legal and compliance departments, and sophisticated information technology and data governance infrastructure. Lowe's knew of California's ALPR Act; knew its vendor operated a national network actively searched by hundreds of law enforcement agencies; made a deliberate enterprise-level decision to deploy Flock cameras at its stores and share feeds with law enforcement; and published an ALPR policy that omits mandatory statutory elements. After Flock's unauthorized data-sharing practices were publicly exposed in California in 2025 and 2026 , including the Mountain View police chief shutting down Flock entirely and Ventura County documenting 364,000 unauthorized out-of-state accesses, Lowe's has not publicly announced any suspension of California ALPR operations, any modification of its Flock data-sharing settings, or any remediation

of the identified deficiencies in its ALPR policy. This continued inaction in the face of known, publicly documented violations is the hallmark of willful and reckless disregard of California law, warranting punitive damages.

**K. Lowe's Knowing, Willful, and Reckless Disregard of California Law**

148. Lowe's violations of the ALPR Act are not the result of inadvertence, technical oversight, or good-faith misunderstanding of California law. They are the product of deliberate, informed corporate choices made with actual knowledge of the Act's requirements and sustained in the face of mounting public evidence that those choices were causing harm to California residents.

***1. Lowe's Knew the ALPR Act Existed and Applied to It***

149. The California ALPR Privacy Act has been in effect since January 1, 2016. Lowe's Home Centers, LLC operates 112 California retail stores, making California compliance a core legal obligation of its operations. Lowe's Companies, Inc. employs a dedicated privacy compliance team and experienced legal counsel with responsibility for California consumer privacy law, including the California Invasion of Privacy Act, and California's surveillance and data protection statutes. Lowe's own publication of ALPR provisions within its Privacy Statement, a document that expressly identifies itself as applying to California residents and addressing California law, is conclusive proof that Lowe's legal team reviewed, analyzed, and made affirmative choices about the content of those provisions.

***2. Lowe's Deliberately Omitted Mandatory Elements***

150. The most critical omissions in Lowe's ALPR policy: (1) meaningful law enforcement sharing restrictions (§ (D)); (2) specific training requirements (§ (B)); (3) a defined monitoring methodology (§ (C)); and (4) adequate accuracy procedures (§ (F)), are not accidental gaps. They are the elements that would impose the most significant operational accountability on Lowe's: committing to a defined oversight process, describing the training its personnel must receive, stating measures that would let a driver learn of and correct a misread, and limiting the scope of law enforcement access. Each omission reflects a choice. The statutory text is unambiguous, and Lowe's privacy team either declined to include these elements or substituted language that does not satisfy them.

### *3. Lowe's Knew Its Vendor Was Sharing Data with Federal Agencies*

151. By no later than August 5, 2025, Lowe's had constructive knowledge that Flock Safety's national network was being used for broad law enforcement access to private retail camera feeds. On that date, 404 Media and the Electronic Frontier Foundation published a widely reported investigation, based on public records obtained from the Johnson County, Texas Sheriff's Office, confirming that the Sheriff's Office had access to tap into "Flock cameras at 173 different Lowe's locations around the U.S." That report explicitly described the law enforcement sharing architecture Lowe's had enabled and identified Lowe's by name as a Flock customer whose camera feeds were accessible to law enforcement. Lowe's did not announce any suspension, modification, or review of its California ALPR operations in response.

### *4. Lowe's Knew Flock Was Secretly Re-Enabling Federal Access*

152. No later than February 3, 2026, Lowe's had actual knowledge of the specific, documented pattern of Flock secretly re-enabling nationwide data-sharing settings at California customer sites without authorization. On that date, Mountain View Police Chief Michael Canfield publicly announced that he was shutting down Mountain View's entire Flock network after discovering that out-of-state and federal agencies had accessed Mountain View's ALPR data without authorization. Chief Canfield's statement was reported in KQED, KION, CBS San Francisco, and dozens of other California news outlets. Lowe's legal and compliance teams, responsible for a multi-billion-dollar California retail operation with 112 stores connected to the same Flock national network, had access to this report. Lowe's did not announce any suspension or modification of its California Flock deployments in response.

### *5. Lowe's Knew of Documented Wrongful Detentions Caused by Flock Misreads*

153. By no later than March 2026, Lowe's had actual knowledge that Flock ALPR misreads had caused at least twelve documented instances of innocent people being stopped at gunpoint, sent to jail, or subjected to police dog attacks. This reporting, published by *Business Insider* in March 2026 after reviewing police records, lawsuits, and local news coverage across the country, expressly identified Flock as the technology Lowe's deployed at its stores. Lowe's ALPR policy states only

that "ALPR matches are always verified with additional evidence" before Lowe's acts on them, a standard it knew, after March 2026, was inadequate to prevent law enforcement from acting on Flock misreads at its own stores. Lowe's made no public announcement of accuracy remediation in response.

***6. Lowe's Knew of the ALPR Litigation Ecosystem***

154. By no later than February 26, 2026, Lowe's had constructive knowledge that California courts had recognized ALPR Act violations by private commercial entities as cognizable harm. On that date, *Bartholomew v. Parking Concepts, Inc.*, No. A171546, was decided by the California Court of Appeal, unanimously reversing a demurrer and holding that failure to implement a compliant ALPR policy is itself "harm" under § 1798.90.54. On the same day, *Javorsky & Mayor v. Flock Group, Inc.*, No. CGC-26-634334, was filed in San Francisco Superior Court, naming Flock Safety directly for sharing California ALPR data with out-of-state agencies more than 1.6 million times. On March 19, 2026, *Linder & Hoffert v. Simon Property Group, Inc.* was filed in Sacramento County Superior Court, naming America's largest mall operator for identical ALPR Act violations using the same Flock camera infrastructure. Lowe's legal team was on notice of each of these developments. Despite the *Bartholomew* decision eliminating its primary legal defense and companion litigation targeting its own vendor and a similarly situated retail co-defendant, Lowe's has not announced any remediation of its deficient ALPR policy, any suspension of California ALPR operations, or any notification to class members of their rights. This continued inaction in the face of known, publicly litigated violations constitutes the willful and reckless disregard of California law that warrants punitive damages under Cal. Civ. Code § 1798.90.54(b)(2) and Cal. Civ. Code § 3294.

***7. Lowe's Companies, Inc.'s Enterprise Control Establishes Corporate Liability***

155. The knowing conduct described in this section is attributable to both Defendants. Lowe's Companies, Inc. is the parent corporation that sets and enforces enterprise-level privacy policy, selects and contracts with vendors including Flock Safety, and directs the compliance standards that Lowe's Home Centers, LLC executes at the store level. The ALPR provisions published within Lowe's U.S. Privacy Statement on lowes.com are a corporate policy of Lowe's

Companies, Inc., not a store-level or divisional document, and were reviewed and approved by Lowe's Companies, Inc.'s legal and privacy teams before publication. The decision to embed ALPR provisions in a general privacy statement and to include an open-ended catch-all law enforcement sharing clause was made at the enterprise level by Lowe's Companies, Inc. Both defendants are therefore independently and jointly liable for the knowing, willful, and reckless conduct alleged throughout this Complaint.

**L. The *Bartholomew, Mata*, and *McGinity* Decisions Confirm That Lowe's Conduct Constitutes Cognizable Harm**

156. On February 5, 2026, the California Court of Appeal, First Appellate District, Division Five, issued its unanimous decision in *Bartholomew v. Parking Concepts, Inc.*, No. A171546, authored by Acting Presiding Justice Mark B. Simons and joined by Justices Gordon B. Burns and Danny Y. Chou. The court issued a modification order on February 27, 2026. Together, the opinion and modification order eliminate the primary legal challenge Lowe's is likely to raise, that Plaintiffs must plead affirmative misuse of ALPR data to establish harm, and leave open the theory directly applicable here.

157. In *Bartholomew*, a private entity deployed ALPR cameras at a parking facility, the 1635 Divisadero Medical Center Parking Garage in San Francisco, without implementing or publicly posting an ALPR usage and privacy policy. The trial court sustained the defendant's demurrer, holding that the mere capture of a plaintiff's license plate could not establish "harm" under Cal. Civ. Code § 1798.90.54. The Court of Appeal unanimously reversed.

158. Justice Simons held that "harm" under the ALPR Act does not require "any type of affirmative mishandling of the data." The court held:

> "[W]hile the ALPR Law does not impose specific restrictions on the use of ALPR information, it grants individuals the right to know which entities are collecting their data and how it is being used and maintained. Collecting and maintaining individuals' ALPR information without implementing and making public the statutorily required policy harms these individuals by violating this right to know."

(*Bartholomew v. Parking Concepts, Inc.* (2026) No. A171546, slip op. (Cal. Ct. App. 1st Dist. Feb. 5, 2026), as mod. Feb. 27, 2026.)

159. The court further held that "the provision of a set amount of liquidated damages demonstrates a legislative intent that cognizable harm does not require a measurable monetary injury." The $2,500 per-person liquidated damages provision confirms that the Legislature intended the failure to post a fully compliant policy, by itself, to be actionable.

160. The February 27, 2026, modification order is particularly significant for this case. The court expressly declined to decide:

> "We express no opinion as to whether collecting and maintaining ALPR information with a usage and privacy policy that does not include every component identified in section 1798.90.51, subdivision (b)(2) would also cause such harm."

This reservation confirms that the court recognized this as a distinct and unresolved question, one directly presented here, where Lowe's maintains ALPR provisions that omit multiple mandatory statutory elements, including meaningful law enforcement sharing restrictions.

161. *Bartholomew* is directly controlling here, and Lowe's violations are more egregious than those at issue in *Bartholomew* in at least three respects. First, the *Bartholomew* defendant operated a single parking garage as a local operator; Lowe's is America's second-largest home improvement retailer with 112 California locations and an enterprise-wide national Flock deployment.

162. Second, the *Bartholomew* defendant had no documented history of enabling federal agency access; Lowe's vendor has a documented, repeated pattern of secretly re-enabling nationwide access settings at California customer sites, exposing data to federal agencies without authorization.

163. Third, and most significantly, *Bartholomew* involved a defendant with no policy at all. Lowe's has published ALPR provisions that it claims satisfy the Act, yet those provisions omit mandatory elements the Legislature specifically required. The February 27 modification order's reservation of the "incomplete policy" harm question is directly answered here: a policy that fails to impose meaningful restrictions on law enforcement sharing and is buried within a general privacy statement rather than conspicuously posted as a standalone ALPR policy does not give California shoppers the "right to know" the Act was designed to protect.

164. The subsequent decision in *Mata v. Digital Recognition Network, Inc.*, D084781, does not disturb *Bartholomew*'s holding or the facts presented here. *Mata* involved a defendant that had implemented and made publicly available an ALPR usage and privacy policy. The plaintiff in *Mata* did not allege that the published policy omitted any element the Act makes mandatory, and the Court of Appeal affirmed summary judgment on a developed evidentiary record rather than resolving a pleading. Here, Lowe's disclosures omit elements the Act makes mandatory, and they are not conspicuously posted; those omissions deprived Plaintiffs of information the ALPR Act required Defendants to make available. Plaintiffs further allege that they personally accessed Lowe's website before or in connection with their store visits but did not encounter the relevant ALPR disclosures.

165. Moreover, unlike a plaintiff who never attempted to obtain information from an operator or end user's website, Plaintiffs here actually accessed Defendants' website in connection with their shopping at Lowe's, and did not encounter an ALPR policy or any ALPR disclosure because Defendants policies were not conspicuously posted. Plaintiffs have further confirmed that the information omitted by Defendant in their policy, and that was not conspicuously posted, was information they wanted to know and would have considered in deciding whether to visit Lowe's, and that they would have shopped elsewhere had Defendants properly and completely disclosed their ALPR practices.

166. Most recently, on August 5, 2026, the United States District Court for the Northern District of California denied a motion to dismiss materially similar ALPR claims in *McGinity v. Reimagined Parking LLC*, 3:26-cv-02760-WHO. After expressly considering both the analysis of *Bartholomew* and the guidance of *Mata*, the court concluded that the plaintiff adequately alleged actionable harm to his "right to know" about the defendant's use of ALPR technology and predicted that the California Supreme Court would recognize violation of a consumer's right to know as actionable harm under the ALPR Law.

167. The *McGinity* court further held that the plaintiff plausibly alleged the defendant was an ALPR operator, or alternatively an end-user, and concluded that the respective roles of the defendant and its ALPR technology vendor were properly determined on an evidentiary record rather than resolved at the pleading stage.

**M. Lowe's ALPR Practices Are Highly Offensive**

168. The California Legislature, in enacting the ALPR Act, recognized that ALPR data "can identify not only a person's exact whereabouts but also their pattern of movement" and can "chill First Amendment protected activity." The surveillance Lowe's has inflicted on shoppers at its 112 California stores is precisely what the Legislature sought to prevent.

169. **First Amendment Surveillance.** Lowe's ALPR data flows into the same Flock national network that the EFF documented was used to surveil protesters and political dissidents in 2025. Through analysis of twelve million Flock search records, the EFF found that more than 50 federal, state, and local agencies ran hundreds of searches connected to protests, including the No Kings protests of June and October 2025, searching Flock camera networks, including cameras at private properties, across thousands of networks simultaneously.[53] By connecting its California store ALPR data to this national network, Lowe's made every California shopper's vehicle data available to agencies conducting mass, suspicionless surveillance of First Amendment activity.

170. **Immigration Enforcement.** Flock's national network has been used extensively for civil immigration enforcement. Documented instances include: law enforcement agencies logging "ICE," "immigration," and "criminal alien" as search reasons; and federal agencies accessing California ALPR data to locate targets for immigration enforcement. Lowe's California ALPR data, fed directly into this national network, is not insulated from these uses.

171. **Knowing, Willful, and Reckless Conduct.** Lowe's is the world's second-largest home improvement retailer with revenues of approximately $83.7 billion. Lowe's chose Flock knowing that Flock operates the nation's largest crime-solving LPR network actively searched by hundreds of law enforcement agencies. Lowe's then published ALPR provisions with deliberate omissions, including no meaningful law enforcement restriction, that reflect calculated policy choices about accountability and data governance. After Flock's unauthorized data-sharing practices were publicly exposed in California in 2025 and 2026, Lowe's has not announced any suspension of

---

[53] First Amendment Report, HAVE I BEEN FLOCKED?, haveibeenflocked.com/first-amendment-records (last visited July 7, 2026); Rindala Alajaji & Dave Maass, License Plate Surveillance Logs Reveal Racist Policing Against Romani People, EFF (Nov. 3, 2025)

California ALPR operations, any remediation of its deficient ALPR policy, or any modification of its Flock data-sharing settings. This continued inaction is willful and reckless disregard of California law, warranting punitive damages.

**N. Tolling Allegations**

172. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of their use of Flock ALPRs, and the scope of information that they collected about Plaintiffs and Class Members.

173. As described above, the Flock ALPRs are inconspicuous. A reasonable person without prior knowledge of Flock's products would not understand the function or scope of information collected by an ALPR. At most, the ALPRs look like standard security cameras; nothing about the ALPR's inconspicuous appearance announces that they are capturing license plate information and combining it with data collected by at least 80,000 other similar units being used to track vehicle and individual location data.

174. Defendant was under a statutory duty to disclose the nature, significance, and consequences of their use of the Flock ALPRs. Despite this obligation, Defendant failed to make a publicly available notice of their use of ALPR systems on their property, and additionally, failed to post on their website notice of usage and privacy practices with regard to the ALPRs present on their property that would have informed Plaintiffs and Class Members that they were being tracked by Flock's surveillance network. By failing to adhere to the duty of disclosure required by the ALPR Law, Defendant concealed its surveillance and Plaintiffs had no way to know that Defendant was aggregating information about them with information from tens of thousands of other cameras.

175. Therefore, through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. As such, Plaintiffs could not have known the information essential to pursue their claims.

176. For these reasons, all applicable statutes of limitation have been tolled pursuant to the discovery rule.

177. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's misconduct would have been shortly before the filing of this Complaint.

178. *Fraudulent Concealment.* Lowe's actively concealed its non-compliant ALPR operations, deploying cameras covertly without adequate disclosure, maintaining policy provisions with deliberate omissions, and never notifying class members that their data was being shared with law enforcement through a national network. Plaintiffs and class members could not have discovered their claims through reasonable diligence prior to the public disclosure of Flock's unauthorized data-sharing practices in California, which began in January 2026.

179. *Discovery Rule.* Because Lowe's did not provide the disclosures required by the ALPR Act, and because Flock cameras are mounted at parking lot entrances without any marking, signage, or disclosure identifying them as ALPR devices collecting and sharing data with law enforcement, the cause of action did not accrue until class members knew or reasonably should have known of the ALPR data collection and law enforcement sharing. Lowe's affirmative failure to post any notice, combined with its vendor's practice of deploying cameras that are not labeled as ALPR systems, actively prevented class members from discovering their claims. For most class members, discovery was not reasonably possible before no earlier than January–February 2026, when the Mountain View Police Department's shutdown of its Flock network and the Ventura County audit disclosing 364,000 unauthorized out-of-state accesses received widespread coverage in KQED, CBS San Francisco, and other California news outlets accessible to a reasonable California consumer. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [under the discovery rule, limitations period does not begin until the plaintiff has reason to suspect an injury and some wrongful cause].)

180. *Class Action Tolling.* The filing of this complaint tolls the period limitations for all class members. (*American Pipe & Constr. Co. v. Utah* (1974) 414 U.S. 538; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1119 ["the filing of a class action tolls the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"].)

//

**O. Plaintiffs' Vehicle Tracking Data Has Quantifiable Economic Value**

181. Vehicle Tracking Data — including license plate numbers, vehicle make, model, color, precise geolocation coordinates, and timestamps — has a well-established and quantifiable economic value in the commercial data marketplace. Commercial entities purchase location and vehicle movement data of precisely this type from data brokers every day to power targeted advertising, audience segmentation, identity verification, fraud detection, insurance underwriting, and risk-scoring products.

182. The Federal Trade Commission has confirmed that location data of the type captured by Lowe's ALPR cameras is a core commodity in the data-broker industry. In its 2014 report Data Brokers: A Call for Transparency and Accountability, the FTC found that data brokers collect, aggregate, and sell consumer data, including location and movement data, to thousands of commercial purchasers, often without consumers' knowledge. The FTC reinforced these findings in its 2024 settlements with X-Mode Social (now Outlogic) and InMarket Media, in which the FTC declared that consumers' "precise location data is sensitive."

183. Plaintiffs attribute economic value to the vehicle and location data Defendants collected, and each Plaintiff would have participated in the market for that data had Defendants disclosed that they were collecting and retaining it. No Plaintiff received, or agreed to forgo, any consideration in exchange for Defendants' collection and retention of that data.

**P. Plaintiffs' Experiences**

***<u>Plaintiff Harhay's Experience</u>***

184. Plaintiff Michael J. Harhay is a natural person and a citizen of the State of California, residing in Lafayette, California. During the class period, Plaintiff Harhay visited the Lowe's store located in Concord, California in Contra Costa County (Store No. 2604), on numerous occasions, including March 14, 2025 and April 21, 2025, where Plaintiff Harhay's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b).

185. On each occasion, Plaintiff Harhay did not observe any notice, signage, disclosure, or posting at the parking lot entrances or exits, on the Flock camera unit, or elsewhere on the property informing shoppers that their vehicle data was being captured by an automated license plate recognition system, stored in a searchable database, or shared with law enforcement agencies.

186. Plaintiff Harhay was not aware, and had no reasonable means of becoming aware, that Lowe's was operating an ALPR system at this location, that Plaintiff Harhay's vehicle data was being captured and retained, or that Lowe's ALPR usage and privacy policy omitted mandatory elements required by California law.

187. Had Plaintiff Harhay known that Lowe's was capturing and sharing his vehicle data with law enforcement through a national network, without a fully compliant ALPR usage and privacy policy under California law, Plaintiff Harhay would not have patronized the store, or would have taken meaningful steps to protect his privacy, for example, by using an alternative entrance/exit not covered by an ALPR camera, or by avoiding the property altogether.

***Plaintiff Schmierer's Experience***

188. Plaintiff William F. Schmierer is a natural person and a citizen of the State of California, residing in Orangevale, California. During the class period, Plaintiff Schmierer visited the Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including May 19, 2024, November 25, 2025, January 5, 2026, February 13, 2026, February 27, 2026 and March 25, 2026, where Plaintiff Schmierer's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b).

189. On each occasion, Plaintiff Schmierer did not observe any notice, signage, disclosure, or posting at the parking lot entrances or exits, on the Flock camera unit, or elsewhere on the property informing shoppers that their vehicle data was being captured by an automated license plate recognition system, stored in a searchable database, or shared with law enforcement agencies.

190. Plaintiff Schmierer was not aware, and had no reasonable means of becoming aware, that Lowe's was operating an ALPR system at this location, that Plaintiff Schmierer's vehicle data

was being captured and retained, or that Lowe's ALPR usage and privacy policy omitted mandatory elements required by California law.

191. Had Plaintiff Schmierer known that Lowe's was capturing and sharing his vehicle data with law enforcement through a national network, without a fully compliant ALPR usage and privacy policy under California law, Plaintiff Schmierer would not have patronized the store, or would have taken meaningful steps to protect his privacy, for example, by using an alternative entrance/exit not covered by an ALPR camera, or by avoiding the property altogether.

***Plaintiff Grimes' Experience***

192. Plaintiff Ashley Grimes is a natural person and a citizen of the State of California, residing in Sacramento County, California. During the class period, Plaintiff Grimes visited the Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including October 30, 2025, February 26, 2026, and March 30, 2026, where Plaintiff Grimes's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b).

193. On each occasion, Plaintiff Grimes did not observe any notice, signage, disclosure, or posting at the parking lot entrances or exits, on the Flock camera unit, or elsewhere on the property informing shoppers that their vehicle data was being captured by an automated license plate recognition system, stored in a searchable database, or shared with law enforcement agencies.

194. Plaintiff Grimes was not aware, and had no reasonable means of becoming aware, that Lowe's was operating an ALPR system at this location, that Plaintiff Grimes's vehicle data was being captured and retained, or that Lowe's ALPR usage and privacy policy omitted mandatory elements required by California law.

195. Had Plaintiff Grimes known that Lowe's was capturing and sharing her vehicle data with law enforcement through a national network, without a fully compliant ALPR usage and privacy policy under California law, Plaintiff Grimes would not have patronized the store, or would have taken meaningful steps to protect her privacy, for example, by using an alternative entrance/exit not covered by an ALPR camera, or by avoiding the property altogether.

***Plaintiff Diegle's Experience***

196. Plaintiff Cameron Diegle is a natural person and a citizen of the State of California, residing in Sacramento County, California. During the class period, Plaintiff Diegle visited the Lowe's store located in Folsom, California, in Sacramento County (Store No. 1087), on numerous occasions, including December 26, 2025 and March 29, 2026, where Plaintiff Diegle's vehicle was captured by ALPR cameras operated by Lowe's and/or its agents without notice adequate to satisfy California law, and without a publicly posted ALPR usage and privacy policy meeting all requirements of Cal. Civ. Code §§ 1798.90.51(b) and 1798.90.53(b).

197. On each occasion, Plaintiff Diegle did not observe any notice, signage, disclosure, or posting at the parking lot entrances or exits, on the Flock camera unit, or elsewhere on the property informing shoppers that their vehicle data was being captured by an automated license plate recognition system, stored in a searchable database, or shared with law enforcement agencies.

198. Plaintiff Diegle was not aware, and had no reasonable means of becoming aware, that Lowe's was operating an ALPR system at this location, that Plaintiff Diegle's vehicle data was being captured and retained, or that Lowe's ALPR usage and privacy policy omitted mandatory elements required by California law.

199. Had Plaintiff Diegle known that Lowe's was capturing and sharing his vehicle data with law enforcement through a national network, without a fully compliant ALPR usage and privacy policy under California law, Plaintiff Diegle would not have patronized the store, or would have taken meaningful steps to protect his privacy, for example, by using an alternative entrance/exit not covered by an ALPR camera, or by avoiding the property altogether.

**CLASS ACTION ALLEGATIONS**

200. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek certification of the following class (hereinafter referred to as "the Class"):

> All individuals whose vehicles were captured by automated license plate reader systems deployed, operated, or controlled by Lowe's Home Centers, LLC, Lowe's Companies, Inc., and/or their agents or vendors at any California retail store location, during the period beginning on the date Flock Safety ALPR cameras were first installed at California Lowe's properties and continuing through the present.

Excluded from the Class are Defendants and their respective officers, directors, employees, agents, affiliates, and subsidiaries; any judicial officer presiding over this matter and their immediate families and judicial staff; and any persons who timely opt out of the Class.

201. **Numerosity.** The class is so numerous that individual joinder is impractical. Lowe's operates 112 California stores drawing millions of shopper visits annually. The precise number will be ascertainable through discovery, including Defendants' and their vendor's ALPR database records.

202. **Ascertainability.** ALPR systems operating at Lowe's California stores maintain logs of every license plate scanned, including timestamps and locations. EFF's analysis of Flock audit records demonstrated that Flock's records identify the date, time, user, network, reason, and license plate for each search. These logs identify, at minimum, the license plate number associated with each class member's vehicle during each visit.

203. **Commonality and Predominance.** Common questions of law and fact exist as to all class members and predominate over any individual issues, including:

- Whether Lowe's qualifies as an "ALPR operator" and/or "ALPR end-user" under Cal. Civ. Code § 1798.90.5;
- Whether Lowe's ALPR policy embedded in its general Privacy Statement fails to include every mandatory element required by §§ 1798.90.51(b)(2) and 1798.90.53(b), including whether the absence of adequate training requirements, defined monitoring methodology, adequate accuracy measures, and meaningful law enforcement sharing restrictions renders the policy non-compliant;
- Whether a non-compliant ALPR police, one that is published but omits mandatory elements, causes "harm" within the meaning of § 1798.90.54, as the *Bartholomew* February 27, 2026, modification order expressly left unresolved;
- Whether Lowe's failure to post a standalone, conspicuously displayed ALPR-specific usage and privacy policy (rather than embedding ALPR provisions in a general privacy statement) independently violates Cal. Civ. Code § 1798.90.51(b)(1);
- Whether Lowe's failed to maintain required security procedures and audit records;

- Whether Flock's documented practice of secretly re-enabling nationwide access settings makes Lowe's liable for resulting unauthorized access under the ALPR Act;
- Whether Lowe's conduct was knowing, willful, and/or reckless; and
- Whether Plaintiffs and the class are entitled to statutory and punitive damages and injunctive relief.

204. **Typicality.** Plaintiffs' claims are typical of those of the proposed class. All class members were subjected to Lowe's uniform ALPR surveillance practices and Lowe's uniform ALPR policy deficiencies across its California stores. All class members were harmed in the same manner and are entitled to the same statutory remedies.

205. **Adequacy.** Plaintiffs are adequate representatives of the class, their interests do not conflict with those of the class, they have retained counsel competent and experienced in ALPR and consumer class action litigation, and they intend to prosecute this action vigorously.

206. **Superiority.** A class action is superior to other available means for adjudicating this controversy. Individual class members lack the resources to individually pursue these claims; individualized litigation would create inconsistent judgments; and the common factual and legal questions are best resolved in a single proceeding. The $2,500 per-person statutory damages are significant in aggregate but modest individually, making class treatment essential.

## CAUSES OF ACTION

### COUNT I
### Violation of California's ALPR Privacy Act
### Cal. Civ. Code §§ 1798.90.5, et seq.
### Unauthorized Access and Use of ALPR Information
**(*By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants*)**

207. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

208. Lowe's Home Centers, LLC and Lowe's Companies, Inc. are each a "person" within the meaning of Cal. Civ. Code § 1798.90.5(e) as limited liability company and corporation, respectively.

209. Lowe's qualifies as an "ALPR operator" within the meaning of Cal. Civ. Code § 1798.90.5(c). Lowe's deployed, owns, and controls the ALPR cameras at its California stores, contracted with Flock Safety as its ALPR vendor, configured access permissions for law enforcement, and made affirmative corporate decisions about how ALPR data would be shared. Flock's provision of cameras, software, hosting and related technical services does not displace Lowe's operational responsibilities. Lowe's statutory status is determined by the functions Lowe's actually performs, and Lowe's performs the functions the Act assigns to an operator. Lowe's also qualifies as an "ALPR end-user" within the meaning of Cal. Civ. Code § 1798.90.5(a) to the extent it accesses, uses, or derives benefit from ALPR data generated at its California stores.

210. Lowe's accessed and used "ALPR information" by capturing, storing, and sharing the license plate data, timestamps, and vehicle characteristics of Plaintiffs' and class members' vehicles at its California stores.

211. As the California Court of Appeal confirmed in *Bartholomew*, collecting and maintaining individuals' ALPR information without implementing and making public a fully compliant policy constitutes "harm" within the meaning of § 1798.90.54. Plaintiffs and class members were harmed because Lowe's collected and used their ALPR information while maintaining policy provisions that omit mandatory statutory elements, failing to give class members the "right to know" the Act was designed to protect.

212. In addition, Lowe's authorized its ALPR vendor to expose California shoppers' data to federal and out-of-state law enforcement through Flock's national network without adequate restrictions and failed to implement any safeguards to prevent Flock from secretly re-enabling nationwide data-sharing settings. This constitutes additional, independent "unauthorized access to or use of ALPR information" within the meaning of § 1798.90.54.

213. Plaintiffs and class members never authorized Lowe's to access or use their ALPR information in a manner inconsistent with a fully compliant ALPR policy.

214. Lowe's conduct was knowing, willful, and reckless, warranting punitive damages.

/ / /

/ / /

215. Pursuant to § 1798.90.54(b), Plaintiffs and the class are entitled to: (1) actual damages, but not less than $2,500 per person; (2) punitive damages; (3) reasonable attorneys' fees and litigation costs; and (4) equitable relief.

**COUNT II**
**Violation of California's ALPR Privacy Act**
**Failure to Implement Code-Compliant Privacy Policy and Maintain Record of Access**
**Cal. Civ. Code §§ 1798.90.51(b), 1798.90.52, 1798.90.53(b)**
*(By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants)*

216. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

217. Lowe's violated Cal. Civ. Code §§ 1798.90.51(b)(2) and 1798.90.53(b) by failing to implement or publicly post a standalone, ALPR-specific usage and privacy policy meeting all required elements, including: (a) meaningful restrictions on law enforcement data sharing (§ (D)); (b) specific training requirements (§ (B)); (c) an adequate monitoring description (§ (C)); and (d) adequate accuracy measures (§ (F)).

218. Lowe's independently violated Cal. Civ. Code § 1798.90.51(b)(1) and 1798.90.53(b)(1) by failing to "implement a usage and privacy policy" as a distinct, conspicuously posted document specific to its ALPR operations, instead embedding ALPR provisions within a multi-page general privacy statement without conspicuous identification.

219. Lowe's violated Cal. Civ. Code §§ 1798.90.51(a) and 1798.90.53(a) by failing to maintain reasonable security procedures, including by: (a) connecting California store ALPR data to Flock's national law enforcement sharing network without meaningful access restrictions; (b) failing to implement contractual or operational safeguards preventing Flock from secretly re-enabling nationwide data-sharing settings; and (c) failing to independently maintain audit records separate from its vendor.

220. Lowe's violated Cal. Civ. Code § 1798.90.52(a) by failing to maintain adequate audit records of each ALPR system access.

221. Lowe's violated Cal. Civ. Code § 1798.90.52(b) by failing to require that ALPR information be used only for authorized purposes described in a usage and privacy policy containing

the information section 1798.90.51(b) requires. Because Lowe's described no such authorized purpose, Lowe's required no limit on the purposes for which the information it collected could be used, and on information and belief the information Lowe's contributed to its vendor's network was available for purposes including out-of-state law enforcement investigation, federal agency access, and immigration enforcement.

222. Lowe's violated Cal. Civ. Code § 1798.90.51(b)(2)(F) by failing to implement adequate accuracy measures, exposing class members to the risk of wrongful law enforcement stops and detentions based on Flock ALPR misreads.

223. Collecting and maintaining ALPR information without implementing and making public a usage and privacy policy containing the information the Act requires harms the individuals whose information it is by violating their right to know. *Bartholomew v. Parking Concepts, Inc.* (2026) 118 Cal.App.5th 438, 449. A federal court in this circuit, considering both *Bartholomew* and *Mata*, has concluded that the California Supreme Court would recognize a violation of a consumer's right to know as actionable harm under the Act. *McGinty v. Reimagined Parking LLC*, No. 26-cv-02760-WHO, 2026 WL 2322918, at *1 (N.D. Cal. Aug. 5, 2026)..

224. Plaintiffs and class members are entitled to liquidated damages of at least $2,500 per person, punitive damages, attorneys' fees, and injunctive relief.

**COUNT III**

**Invasion of Privacy Under California Constitution, Article I, Section 1**

*(By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants)*

225. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

226. Article I, section 1 of the California Constitution ensures an inalienable right to privacy, and it creates a right of action against private as well as governmental entities. *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15-20. To state a claim a plaintiff must establish a legally protected privacy interest, a reasonable expectation of privacy in the circumstances, and conduct by the defendant constituting a serious invasion of privacy. *Id.* at pp. 39-40. Plaintiffs and

Class Members have a legally protected privacy interest in their vehicle movements, travel patterns, and the data derived from them.

227. Plaintiffs and class members had a reasonable expectation of privacy when visiting Lowe's California stores. A reasonable person visiting a hardware store does not expect that their license plate data will be automatically captured, timestamped, stored in a national database, and made accessible to hundreds of law enforcement agencies, including federal immigration enforcement, all while the operator maintains policy provisions that omit mandatory disclosure elements and provide no meaningful restriction on who can access the data.

228. Lowe's conduct, specifically deploying a pervasive ALPR surveillance network across 112 California stores, connecting it to a national law enforcement database, and maintaining ALPR provisions that fail to give class members meaningful notice of their rights, constitutes a serious invasion of privacy that is offensive and objectionable to any reasonable person. The systematic, covert capture and law enforcement sharing of the vehicle movements of millions of California residents shopping at a routine hardware store constitutes an egregious breach of social norms.

229. Lowe's invasion of privacy is sufficiently serious in nature, scope, and actual or potential impact to constitute an egregious breach of social norms warranting judicial relief:

- *Nature:* Pervasive capture and law enforcement sharing of vehicle movement data for every visitor to 112 California retail stores;
- *Scope:* Millions of class members across California's most populous counties;
- *Actual Impact:* Documented exposure to federal surveillance through Flock's national network, including federal immigration enforcement, First Amendment protest monitoring, and risk of wrongful detention based on ALPR misreads.

230. As a result of Lowe's conduct, Plaintiffs and Class Members have suffered harm to their privacy interests. Whether damages are available for a violation of the privacy clause against a private party remains unsettled; the California Supreme Court has stated that it has "no occasion to consider in the present case the circumstances under which the privacy clause of the state Constitution may support a cause of action for damages." Katzberg v. Regents of University of California (2002)

29 Cal.4th 300, 313, fn. 13. Plaintiffs therefore seek declaratory and injunctive relief on this Count and seek damages in the alternative to the extent the Court determines that damages are available.

**COUNT IV**
**Intrusion Upon Seclusion**
(*By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants*)

231. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

232. Lowe's intentionally intruded upon the solitude and seclusion of Plaintiffs and class members, and upon their private affairs and concerns, by deploying ALPR cameras at its California stores to systematically capture, record, and share their vehicle movement data without adequate notice or consent.

233. Plaintiffs and class members had an objectively reasonable expectation that their vehicle movements and travel patterns at a routine hardware store would not be covertly captured and fed into a national law enforcement surveillance network accessible to federal agencies without meaningful restriction. The pervasive, suspicionless nature of the surveillance, every vehicle, every visit, across 112 California stores, differentiates Lowe's conduct from any legitimate security purpose and constitutes an intrusion into information that Plaintiffs and class members regarded as private.

234. Lowe's intrusion would be highly offensive to a reasonable person. The capture of vehicle movement data, its aggregation into profiles of shoppers' habits and lives, its disclosure to federal agencies conducting immigration enforcement and First Amendment surveillance, and its exposure through a vendor whose track record of unauthorized data-sharing is now publicly documented, all without adequate notice to the individuals being surveilled, is precisely the conduct California law and the California Constitution expressly condemn.

235. Lowe's likely argument, that license plates are visible in public and therefore subject to no reasonable expectation of privacy, does not defeat this claim. The California Supreme Court has recognized that the relevant question in an intrusion claim is not whether any single piece of information was publicly observable, but whether the *manner, scope, and aggregation* of the intrusion would be offensive to a reasonable person. (*Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 286–

287.) Lowe's operates ALPR cameras at 112 California stores, each capturing every vehicle's data at every visit, accumulating, over time, a longitudinal record of movement patterns, shopping habits, geographic associations, and daily routines that no member of the public would expect to be compiled and made available, in real time, to hundreds of law enforcement agencies across the country. (*United States v. Jones* (2012) 565 U.S. 400, 416 (Sotomayor, J., conc.) [long-term aggregation of location data "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations"]; *American Civil Liberties Union Foundation v. Superior Court*, 3 Cal. 5th 1032, 1043-1044 [California Supreme Court recognized that mass indiscriminate ALPR data collection raises "serious privacy concerns" because aggregated records "reveal the schedule of the vehicle's registered owner and of those who live or work near where it is frequently parked"].)

236. As a result of Lowe's conduct, Plaintiffs and Class Members have suffered harm to their privacy interests entitling them to damages and injunctive relief.

**COUNT V**
**Violations of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.****
*(By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants)*

237. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

238. The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." (Cal. Bus. & Prof. Code § 17200.) Lowe's conduct violates all three prongs.

239. *The Unlawful Prong.* Lowe's violations of Cal. Civ. Code §§ 1798.90.51, 1798.90.52, and 1798.90.53, including the maintenance of ALPR provisions that omit mandatory elements, the failure to maintain adequate security procedures and audit records, and the unrestricted sharing of California ALPR data with law enforcement, each constitute independent unlawful predicate acts under the UCL.

240. *The Fraudulent Prong.* Lowe's failed to disclose material facts to shoppers and visitors, including that: (a) Lowe's deployed ALPR cameras capturing every visitor's vehicle data at each California store; (b) that data was being shared with and made accessible to law enforcement

with no meaningful restriction on federal agencies or immigration enforcement; and (c) Lowe's ALPR provisions omit mandatory statutory elements that would have given class members meaningful information about their rights. These omissions were likely to deceive reasonable members of the public, who would not have patronized Lowe's had they known the full truth about Lowe's surveillance practices and policy deficiencies.

241. *The Unfair Prong.* Lowe's conduct is unfair because it offends the public policy codified in California's ALPR Act and the California Constitution; is immoral, unethical, and oppressive in its pervasive surveillance of ordinary California shoppers across 112 stores without a fully compliant policy; and causes substantial injury to class members, whose vehicle movement data is aggregated, profiled, and exposed to federal law enforcement without the disclosure and restrictions the Legislature mandated, without any countervailing consumer benefit.

242. Plaintiffs and class members lost money or property because they patronized Lowe's and made purchases there, receiving a transactional benefit diminished by the unlawful surveillance; they paid for a retail shopping experience without receiving the privacy protections mandated by California law, and would have shopped elsewhere had they known that Defendants were collecting and retaining their vehicle and location data without the disclosures California law requires.

243. Plaintiffs seek restitution, disgorgement of all unjust enrichment derived from Lowe's unlawful ALPR practices, injunctive relief compelling full compliance with California law, and all other relief available under the UCL.

244. Unjust Enrichment. Alternative Equitable Relief. In the alternative, and to the extent equitable relief is available, Lowe's has been unjustly enriched at the expense of Plaintiffs and Class Members. Lowe's obtained access to Flock Safety's national surveillance network — a commercial service with quantifiable economic value — by contributing Vehicle Tracking Data captured from every vehicle entering its California parking lots. That data was captured from Plaintiffs and Class Members without their knowledge and without the legally required disclosures. Lowe's obtained this benefit without paying for it in any currency other than the Vehicle Tracking Data of its customers — data Plaintiffs and Class Members never consented to furnish. Plaintiffs seek restitution of the

value of their data unjustly obtained and retained by Lowe's, as an alternative equitable remedy under this Court's equitable jurisdiction, in an amount to be determined at trial.

245. Prospective injunctive relief is both necessary and appropriate. A policy update that merely adds boilerplate language nominating addressing the omitted elements, without verifying that the vendor's actual data-sharing practices comply, without terminating or modifying the national network architecture that exposes California data to federal agencies, and without establishing independent audit and retention records separate from Flock's, would not provide class members with the substantive protection the ALPR Act requires. Only an injunction requiring (i) immediate cessation of unauthorized sharing, (ii) implementation of an independently verified, compliant standalone ALPR usage and privacy policy, (iii) destruction of data collected during the non-compliance period, and (iv) independent auditing will provide the relief necessary to protect the class. (*See* Cal. Civ. Code § 1798.90.54(b)(4); Cal. Bus. & Prof. Code § 17203.)

## **COUNT VI**
## **Negligence and Negligence Per Se**
(*By Plaintiffs, Individually and on Behalf of All Class Members, Against All Defendants*)

246. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

247. *Duty*. Lowe's owed Plaintiffs and class members a duty of reasonable care with respect to the collection, maintenance, security, and disclosure of their ALPR information. This duty arises from multiple independent sources:

248. **Duty by Statute.** California's ALPR Act, Cal. Civ. Code §§ 1798.90.5 *et seq.*, expressly imposes mandatory obligations on ALPR operators to maintain reasonable security procedures, implement a fully compliant usage and privacy policy, restrict data sharing to authorized purposes, and maintain access audit logs. The Legislature enacted the ALPR Act for the benefit and protection of the class of persons to whom Plaintiffs and class members belong — California residents whose vehicle data is captured by ALPR systems.

249. **Duty by Undertaking.** Lowe's undertook to deploy, operate, and govern an ALPR surveillance system at its California stores and published ALPR provisions within its Privacy

Statement. Under California law, one who voluntarily undertakes to perform a service for the benefit of another assumes a duty to perform that service with reasonable care. (*See* Restatement (Second) of Torts § 324A; *Paz v. State of California* (2000) 22 Cal.4th 550.)

250. **Duty from Special Relationship.** Lowe's invites millions of members of the public onto its California premises as business invitees for the purpose of conducting commercial transactions. Lowe's owes business invitees a duty of care that encompasses the manner in which it collects and handles their personal data during and arising from those visits.

251. **Duty from Foreseeability.** It was objectively foreseeable that deploying Flock cameras connected to a national law enforcement sharing network, without a fully compliant ALPR policy, without adequate access restrictions, and with a vendor whose unauthorized data-sharing practices were publicly documented across California agencies, would harm the individuals whose vehicle data was captured.

252. *Negligence Per Se*. Lowe's violations of Cal. Civ. Code § 1798.90.51(b)(2)(B), (C), (D), and (F) constitute negligence per se under Cal. Evid. Code § 669. The ALPR Act was enacted to protect the specific class of persons harmed here, California residents whose vehicle data is captured by ALPR systems, from the specific kind of harm at issue here: unconsented covert surveillance and loss of the right to know how their data is used. (*Elsner v. Uveges* (2004) 34 Cal.4th 915.)

253. *Breach.* Lowe's breached its duty of care to Plaintiffs and class members through the following acts and omissions:

- Embedding ALPR provisions within a general privacy statement rather than implementing and conspicuously posting a standalone ALPR-specific usage and privacy policy, in violation of Cal. Civ. Code § 1798.90.51(b)(1);
- Including a law enforcement sharing clause that imposes no meaningful restriction on out-of-state agency access, federal agency access, or immigration enforcement access, in violation of § 1798.90.51(b)(2)(D);
- Connecting California store ALPR data to Flock's national law enforcement sharing network without implementing contractual or operational safeguards to prevent Flock

from secretly re-enabling nationwide data-sharing settings, in violation of § 1798.90.51(a);

- Failing to independently maintain comprehensive audit records of each instance of ALPR system access as required by § 1798.90.52(a); and
- Failing to implement adequate accuracy measures, providing only that "ALPR matches are always verified with additional evidence," with no defined frequency, no process for correcting data already transmitted to law enforcement, in violation of § 1798.90.51(b)(2)(F).

254. *Causation.* Lowe's breaches of duty directly and proximately caused harm to Plaintiffs and class members, including: (a) the capture, storage, and nationwide law enforcement exposure of their vehicle movement data without the full disclosure and restrictions required by California law; (b) loss of their legally-protected right to know which entities are collecting their ALPR data and how it is being used and maintained, as recognized by the Court of Appeal in *Bartholomew*; (c) exposure of their vehicle data to federal agencies, including immigration enforcement agencies, through Flock's national network, without authorization, consent, or adequate restrictions; (d) the foreseeable risk of wrongful law enforcement stops, detentions at gunpoint, arrests, and police dog attacks caused by Flock ALPR misreads; and (e) the diminishment of the economic value of their personal vehicle data.

255. *Damages.* As a direct and proximate result of Lowe's negligent conduct, Plaintiffs and class members have suffered harm in an amount to be proven at trial, including actual damages, consequential damages, and such other damages as the Court deems just.

256. Lowe's conduct was willful, oppressive, and malicious within the meaning of Cal. Civ. Code § 3294. Lowe's is the world's second-largest home improvement retailer with approximately $83.7 billion in fiscal 2025 revenues and experienced legal, compliance, and privacy departments. Lowe's affirmatively published ALPR provisions while knowingly omitting mandatory statutory elements; continued to operate its California ALPR network after Flock's unauthorized data-sharing practices were publicly documented across multiple California agencies; and has not

remediated its deficient ALPR provisions or suspended California ALPR operations despite constructive knowledge of the ongoing violations. Plaintiffs seek punitive damages on this count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all class members, respectfully request that the Court:

a. Certify this action as a class action pursuant to California Code of Civil Procedure section 382, designate Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

b. Declare that Lowe's has violated California's ALPR Privacy Act, Cal. Civ. Code §§ 1798.90.5 *et seq.*;

c. Award actual damages, or not less than statutory liquidated damages of $2,500 per person per violation, pursuant to Cal. Civ. Code § 1798.90.54(b)(1);

d. Award punitive damages pursuant to Cal. Civ. Code § 1798.90.54(b)(2) based on Lowe's knowing, willful, and reckless disregard of California law;

e. Enter a permanent injunction requiring Lowe's to:

i. Immediately implement and conspicuously post a standalone, ALPR-specific usage and privacy policy meeting all mandatory elements of Cal. Civ. Code §§ 1798.90.51(b)(2) and 1798.90.53(b), meaningful restrictions on law enforcement sharing (including restrictions on out-of-state and federal agency access), specific training requirements, defined monitoring procedures, and adequate accuracy measures, at each California store location and on Lowe's website;

ii. Immediately cease sharing California ALPR data with any law enforcement agency not authorized by a fully compliant ALPR usage and privacy policy that satisfies all elements of Cal. Civ. Code §§ 1798.90.51(b)(2) and 1798.90.53(b), including restrictions on out-of-state and federal agency access;

iii. Post conspicuous notice at all California store parking lot entrances informing visitors that ALPR cameras are in use, the identity of the ALPR operator, and the URL of a compliant usage and privacy policy;

iv. Delete all California ALPR data collected during the period of non-compliance, except as required by law;

v. Terminate or modify any ALPR vendor relationship that does not permit Lowe's to independently maintain and verify access controls, audit records, and restrictions on federal and out-of-state data sharing consistent with California law;

vi. Submit to independent audit of its ALPR data practices and vendor compliance for a period of not less than three (3) years following entry of judgment; and

vii. Implement contractual safeguards with its ALPR vendor requiring explicit, affirmative re-authorization by Lowe's before any change to data-sharing settings, and independent maintenance of audit records separate from vendor-held records;

f. Award restitution and disgorgement of any unjust enrichment Lowe's derived from its unlawful ALPR practices;

g. Award prejudgment interest on all amounts awarded;

h. Award Plaintiffs and the class their reasonable attorneys' fees and litigation costs pursuant to Cal. Civ. Code § 1798.90.54(b)(3) and applicable law;

i. Award compensatory and punitive damages for Lowe's negligence and negligence per se as alleged in Count VI, including damages for actual harm suffered by class members who experienced wrongful law enforcement contacts arising from Flock ALPR misreads attributable to Lowe's failure to implement adequate accuracy measures; and

j. Grant such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable.

DATED: November 2, 2026

By: */s/M. Anderson Berry*
M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Brandon P. Jack (SBN 325584)
**EMERY | REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825

916.823.6955 (Tel)
206.441.9711 (Fax)
*anderson@emeryreddy.com*
*gregory@emeryreddy.com*
*brandon@emeryreddy.com*

Heather M. Lopez (SBN 354022)
Mike Acciavatti*
**MILBERG PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
(331) 240-3015
*hlopez@milberg.com*
*macciavatti@milberg.com*

*Counsel for Plaintiffs Michael J. Harhay and William F. Schmierer and the Proposed Class*

Michael Connett (SBN 300314)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, California 90017
(772) 783-8436
mconnett@sirillp.com

*Counsel for Plaintiffs Ashley Grimes and Cameron Diegle and the Proposed Class*

Philip L. Fraietta (SBN 354768)
Julia K. Venditti (SBN 332688)
**BURSOR & FISHER, P.A**
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
pfraietta@bursor.com
jvenditti@bursor.com

* *pro hac vice* forthcoming

# EXHIBIT A

# Lowe's Privacy Notice

View as PDF

Versión en español

## Welcome!

**Thanks for being a Lowe's customer!**

You're here because you care about your privacy—and we do too. Whether you interact with us online or in stores, we want you to understand how we collect, use, store, and share your information. If you'd like to make choices about your personal information, we'll help you do that too.

## How to Find What You're Looking For

This Privacy Notice is split into short sections, so you can find what you need quickly.

Here's what's in it:


- Our Website
- Our Stores
- Our Apps
- Children's Privacy and Our Kids Club
- Customer Service and Mylow
- Rewards Program and Discounts
- Credit Cards and Financing
- Delivery, Installation, and Related Services
- Insights We Develop About You
- Information Collected From or Shared with Others
- Advertising, Marketing, and Promotions

[Your Rights and Choices]
[Who We Are and How to Contact Us]
[What Haven't We Covered?]

Want a quick chart that shows the types of personal information we collect and why? Click **here**.

## What is Personal Information?

Let's start with what we mean when we talk about "**personal information**." Personal information is information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with you. Personal information does not include information that is publicly available, deidentified (meaning it cannot reasonably be used to identify you), or aggregated (combined with data about others in a way that no longer identifies you or anyone else). Where we maintain deidentified data, we will maintain and use the data in deidentified form and not attempt to reidentify the data except as required or permitted by law.

**Personal information is more than just your name or phone number**—it includes any information that can be linked to you and your business, like what you buy, browse, or prefer. We get some of this information directly from you when you make a purchase on our website, mobile app, or in our store, but a lot of it is collected as you browse our website or use our services, or from trusted partners. We use this information to better understand your needs, improve our products and services, and personalize your experience with us.

## Our Website

When you use our website, we collect information about you and your device to make the site work, let you shop, and improve your experience. We also use some information to show you tailored ads and deals we think you'll love. Sometimes you can limit what we collect, but in some cases, we need certain details to provide a service (like shipping your order). Read below to learn how we collect, use, and disclose your personal information when you browse, buy, or interact with us online.

### Browsing Our Website

When you browse our site, we collect what you tell us — like your searches, quote requests, chat messages, or Contact Center notes — so we can help you and improve our services. We also use this info for analytics and marketing. If you upload a photo to search for a product, we'll store that photo only to provide the image-search feature.

Some information is collected automatically when you visit our site — including things like your **IP address, pages you visit, browser and device type, language,** and **approximate location**. We use these details to remember your preferences, show correct prices and delivery options, give local info (like weather or growing zone), improve the site, enhance our products and services, and show you tailored ads.

Want to learn more? See our Cookies, Pixels, and Other Online Tracking Technologies section.

### Creating an Account

When creating a Personal or Pro Account, you give us your **name, email, phone,** and a **password**. If you create a Pro Account, we will also ask you for your business name and industry. We will then generate a Pro

Account ID so that you can add others in your business. You can also sign in with a **passkey** (fingerprint or face unlock). If you choose to do that, we don't receive or store your fingerprint or facial data — that stays on your device.

When you create a Personal or Pro Account, you're automatically enrolled in MyLowe's Rewards.

Want to learn more? See **Our Rewards Program** section for details.

### Making a Purchase Online

To place an order online we collect what's needed to fulfill it — like your **name**, **contact info**, **payment details**, and **shipping or pickup address**. If you're logged into your MyLowe's Rewards account, we'll link the order to your Account so you can see it in your purchase history and checkout faster. If someone else places an order and provides your info (for pickup or delivery), we may collect the details they give so you can receive the order. We use order info to fulfill the order, contact you about it, and handle warranties or rebates. We also analyze purchase data, including inferences (what we think you might be interested in based on what you buy), to improve our services and personalized offers.

We also receive information related to your preferences and/or insights when you submit an online product review or participate in a survey about a product you've purchased.

Want to learn more? See **Online Reviews and Surveys** section for details.

### Shopping Lists

You can create shopping lists for favorite or frequently purchased items, projects, or articles. After you make a list, you can print it, email it to yourself, or share it with others. If you share a list, we'll ask for the recipient's **email** so we can send it.

### Subscription Programs

We offer our Personal Accountholders subscription services (like recurring product deliveries) and Homecare Plus as part of our MyLowe's Rewards Program. When you sign up, we collect **basic account** and **payment** info. For some services we may also collect home details — for example your **address** or **photos** you upload so we can provide the service. We may supplement that info with third-party data to give you better recommendations.

### Online Reviews and Surveys

If you leave a review or take a survey, we or our trusted third-party partners collect only what you choose to share, like your **name, contact info, answers, photos,** and **ratings**. Some surveys may ask optional **demographic** questions (like **age, language preference, race, gender**) and questions about **products** you've purchased. We receive any of this voluntary demographic information in an aggregated or anonymous form and it is collected solely to help ensure accurate survey sample representation. We do not sell this information. We may analyze responses and reviews to derive **insights or inferences about consumer preferences**, interests, or satisfaction with our products and services to ultimately help us improve your experience.

### Cookies, Pixels, and Other Online Tracking Technologies

**We use cookies and similar tools** to understand how you use our website and to make your experience better. Some of these cookies come from our partners, like advertisers or service providers. You can manage your cookie preferences anytime in our cookie preference center**.** While we offer options for adjusting your cookie preferences for non-essential cookies on our website, if you do not want to have cookies placed on your device, you should clear your cache and set your browser to refuse cookies before re-accessing our website.

Cookies are small files that websites store on your device through a web browser to help that website or third-party systems recognize your device and remember information — like what's in your shopping cart or your preferred language. Web beacons (sometimes called tracking pixels) are tiny graphics embedded on a webpage or in an email that help us understand how people use our website and emails — like if you open one of our emails or visit a certain page.

In general, we use these technologies to:

- **Make our website work properly** — for example, by allowing you to log in, stay logged in, and add items to your cart
- **Improve your experience** — by remembering your preferences (like language or region) and personalizing content for you
- **Understand how our website is used — we use tools such as Google Analytics and Adobe Analytics to** understand how our website is used, see what products most interest you, and understand how you interact with our site and ads
    - You can opt out of Google Analytics by installing the Google Analytics browser add-on, available **here**
    - You can opt out of **Adobe Analytics** **here**
    - We also use session-replay tools, like **Fullstory**, to see how visitors use our services and track browsing patterns to make improvements— to opt out of Fullstory, click here
- **Show you tailored ads—** our ad partners may use cookies to display ads that match your interests on other websites or social media
    - You can adjust your cookie preferences and opt out of **targeted advertising, sales, and sharing of personal information** anytime through our **cookie preference center**
    - You can also opt out of targeted advertising through the **Digital Advertising Alliance** or opt out of ads from Google by visiting the **Google Ads Settings page**
    - Although our website responds to certain browser-based opt-out preference signals, such as Global Privacy Control, our website does not respond to "Do Not Track" signals
- **Measure email performance** — we use tracking tools to see if our emails are opened or if links are clicked

Cookies vary in how long they last. Some cookies only last while you're on our website — these are called s**ession cookies.** They disappear once you close your browser. Others, called **persistent cookies,** stay on your device until a set expiration date. We use both types of cookies to help our website run smoothly and improve your experience.

<<Insert Cookie Module with Blank H2 for hyperlink>>

## Third-Party Features and Links

Some parts of our website use third-party tools, like social media buttons (for example, "Like" or "Login with

Facebook") or video players. These tools may collect information such as your **IP address**, or which pages you visit and send it to the company that provides the feature.

When you use these features, we may get limited information from that third party, and they may receive details about how you use our site. Any personal information collected by those companies is handled under their own privacy policies, not ours.

Our website also includes links to other sites. When you click a link that takes you off Lowe's, you're leaving our site, and this Privacy Notice no longer applies.

### Information Storage, Security, and Fraud Prevention

We keep your information to meet the purposes described in this Privacy Notice and to comply with our recordkeeping, legal, or business obligations. This means we hold onto it to fulfill the reason we collected it, resolve disputes, or enforce our rights.

When deciding how long to keep information, we consider what type it is, how sensitive it is, legal requirements, and whether we can meet the same need in other ways. Once it's no longer needed, we delete it or remove identifying details following our data retention policies.

We take your privacy and the security of your information seriously. We use a mix of administrative, technical, and physical safeguards to help prevent unauthorized access, loss, or misuse of personal information.

We may also use the personal information we collect to prevent fraud, detect security issues, and protect you, us, and others from malicious activity. While we do our best to protect your information, no system is completely secure. Because of how the internet and technology work, we can't guarantee absolute security, but we take reasonable steps to protect your data.

## Our Stores

When you shop in our stores, we collect information about you that helps us better serve you, run our operations, and keep everyone safe. Here's how and why we collect it.

### Store Entrance—Come on in!

Our store associates are here to help you find what you need, answer questions, or help with orders. You'll also find pickup options for online purchases right at the entrance.

### Pickup Zone

When you use curbside pickup, we collect information to confirm your order and prevent fraud, like your **name, photo ID, payment card,** and **order number**.

You can check in through the Lowe's App or the link we **email** you. If you turn on location services, we'll use your **precise location** to get your order ready and find you when you arrive.

### Locker Pickup

Some stores have lockers so you can pick up orders fast. To make sure only you (or someone you choose) pick up the right order, we may collect your **phone number** and a quick **photo** at pickup.

### Shopping and Aisle Browsing

Our in-store tools and the Lowe's App can help you find products fast. Want to learn more? See the **Lowe's App** section for details.

If you can't find something in store, our associates can help you order it for delivery. To do that, we'll collect the details needed to complete your order, like your **contact info, delivery address,** and **billing info**.

### In-Store Wi-Fi

Some stores offer free Wi-Fi so you can look up products or access your Lowe's Account while you shop. When you connect, we may collect technical details like your **device ID, IP address,** and **MAC address**. We use this information for security, troubleshooting, and to recognize your device next time.

### Design Services and Tools

Our design experts can help bring your project ideas to life — in store or online. For example, you can use Style Your Space in the Lowe's App to upload photos and visualize new looks or try Lowe's Style Studio in select stores using Apple Vision Pro. Want to learn more? See the **Style Studio** section for details.

Prefer to plan from home? Our online Kitchen Visualizer and other tools let you upload **photos** and explore design ideas.

### Customer Service

Our customer service team is here to help with any project questions or requests. Depending on what you need, we may collect **contact info, project details, photos**, or **measurements** to prepare quotes, fulfill your request, connect you with installers, or communicate with you about our products and services.

If you call us, we may r**ecord the call** for quality and training. You can also reach us online or chat with Mylow, our virtual assistant.

### Pro Desk

For our Pro customers, the Pro Desk helps you save time and money through our dedicated checkout lanes and dedicated support. Depending on the type of request, we may collect your **name, phone number, address, email address**, and the **payment information** associated with your Pro Account. We may also collect project or commercial information about your customer's property or project (like photos, blueprints, measurements or floorplans). We use this information to fulfill your service request, provide you with quotes for your projects, products and services, and to communicate with you.

We also offer you dedicated customer service by **phone** or via our AI virtual assistant, Mylow. If you call customer service, we may **record the call** for quality and training.

Want to learn more? See the **Checkout** section for details.

### Tool Rental

When you rent tools or equipment, we collect basic details like your **name, birth date,** and **driver's license**. Where allowed, we may scan your **license** to confirm it's valid. If you don't have an Account with us, we'll also need your **contact info**.

Renting a vehicle? We'll ask for a bit more info – like proof of insurance.

### Checkout

When you checkout in our stores — whether with an associate, at self-checkout, or through one of our other easy options — we collect information that we need to complete your purchase, including **payment information**. For store security at checkout, we may also use cameras.

Want to learn more? See the **Cameras and Store Security** section for details.

If you're having something delivered, we'll ask for your **email, phone number,** and **shipping address**. If you add a **warranty** or **protection plan**, we may collect a bit more information to support that coverage through our trusted partners. Typically, this includes things like your **name, phone number, home address**, and the products or services you purchased.

Are you a Rewards member? Don't forget to provide your Rewards info at checkout to enjoy additional benefits, like earning points on eligible purchases and member-only deals and discounts.

We're proud to offer discounts for active-duty military, veterans, their spouses, and first responders. To verify eligibility and prevent fraud, we may check a **government-issued ID**. Where allowed by law, you can speed up verification at self-checkout by choosing to scan your driver's license or state ID — we don't store the information from the scan. Except in limited circumstances, such as for tool rentals and Lowe's Commercial Account transactions, you can skip the scan and ask a store associate to verify your ID manually.

**Want to learn more? See the Rewards Program and Discounts section for details.**

### Returns and Exchanges

In most cases, we only need your **name, receipt**, and **payment info** to process a return. If you don't have a receipt, or if you later use a merchandise card issued from a no-receipt return, we may ask to see a **government-issued ID** to help prevent fraud.

### Cameras and Store Security

We use cameras in our stores to help create a safer, better shopping experience.

**In-Store Cameras.** Our cameras may be in fixed locations throughout the store or physically worn by trained security specialists. They capture **video**, **audio**, and **images** to understand foot traffic, monitor shelves, respond to things like spills or theft, and analyze how long customers stay in our stores and what aisles they visit. Like all cameras, our cameras can capture physically visible attributes, such as characteristics like **race, ethnicity,** or **disability**. We do not sell this information. To learn how we share videos from these cameras or images taken from such videos, read the **Information We Share with Others (Legal and Safety Reasons) section below.**

In some states, we use image matching and analysis technology on images taken from **recorded footage**, to help aid investigation into incidents. Our Asset Protection and Store Operations teams only review footage and use this technology in response to, and after, an incident.

We also use cameras in the checkout areas to monitor lines, help prevent theft and improve the shopping experience. These cameras may capture your **image** and **product** you purchase.

We use this data solely to enhance store safety and understand how people move through our spaces. While we don't routinely share this footage with third parties or law enforcement, we may do so if required or appropriate.

**Parking Lot Cameras.** At some of our stores, you might notice cameras in the parking lot. These cameras capture **video** and **images** of **you**, your **vehicle**, and **others** (along with the **date**, **time**, and **general location**) to help deter crime and promote safety. Our Asset Protection team reviews footage regularly as part of our commitment to keeping you and our associates, and our stores and products safe.

### Automated License Plate Recognition

At some of our stores, and when allowed by law, we use cameras with automated license plate reader ("ALPR") technology near and around parking areas. These systems use cameras to automatically capture images of **vehicles** and their **license plates**, along with the **date, time,** and **general location**. We use this

technology for limited, authorized purposes. Personal Information is collected through ALPRs to help ensure security, prevent theft and fraud, assist with parking enforcement, and to help maintain your safety and the safety of individuals and our properties.

**Associate and Independent Contractor Access**

Trained Asset Protection associates, information security staff, and select service providers who maintain or improve the system may use or access ALPR data. Each person must complete Lowe's ALPR training before gaining access and must renew that training every year.

**Sharing with Law Enforcement**

We only disclose your personal information if required by law or legal process, or when we believe doing so will help protect the safety, property, or rights of individuals or Lowe's. Examples include:

- Protecting the health or safety of individuals.
- Addressing crimes committed on Lowe's property.
- Identifying and addressing fraud or financial risk.
- Responding to a request from state or local law enforcement.
- A search warrant, other judicial order, or valid legal process.
- Assist with fraud prevention and potential criminal activity.

**Sale and Sharing with Others**

We do not sell ALPR information and we only share it with select service providers who help us maintain the technology and the National Center for Missing and Exploited Children.

**How We Keep the Data Secure**

Our ALPR systems are monitored by our Asset Protection team to ensure data is handled properly and lawfully. Access is role-based and audited, and system activity is regularly reviewed to confirm proper use. We also validate system accuracy and performance at least monthly to make sure the data remains reliable.

**Oversight and Custodianship**

Lowe's Vice President of Asset Protection is the official custodian responsible for overseeing Lowe's ALPR systems, ensuring compliance with this policy, and coordinating with our Legal Team for periodic reviews.

**Data Accuracy and Correction**

We take reasonable steps to ensure that ALPR data is accurate and current. ALPR matches are always verified with additional evidence (such as security camera footage) before being used in any investigation. If data errors are identified, they are corrected or removed promptly.

**Data Retention**

Lowe's retains ALPR data only as long as necessary for the reasons described above — typically no more than 90 days (though shorter in certain states), unless it's needed for an active investigation or to comply with a legal obligation. After that, the data is permanently deleted.

## Our Apps

Our apps are designed to make shopping and home projects easier. You can use them to find the right products, check-in when picking up an order, or even preview how something looks in your space before you

buy. To do this, the apps collect some information about you and your device and may use built-in features like your camera. Below is a quick overview of what each app does.

### Lowe's App

When you download the Lowe's App, you can sign in, create a MyLowe's Rewards account, or shop as a guest. We might ask for your **location** or **ZIP code** so we can show nearby stores, accurate pricing, and local offers. As you use the app, we also learn about your **shopping preferences** and how you interact with us. This helps us deliver the services you ask for and improves your overall experience.

We may use your device's **advertising ID** to show you relevant ads and see how they perform.

If you choose to share your **location**, we can help you:

- Find nearby stores and in-stock products
- Let the store know when you're on your way to pick up an order
- Get local info like weather, discounts, and special offers
- Navigate inside the store and find what you viewed online

While we don't track your steps like a fitness app, we may use motion data to understand how shoppers move through the store and improve our app features. Your location data is usually precise (within about 1,850 feet) but sharing it is totally your choice. You can allow or turn off location sharing anytime in your device or app settings.

Want to see how a product fits in your home before buying? The app's Style Your Space and Kitchen Inspiration features use **photos** and **AI tools** to help you visualize ideas. You can also access MyLow, our AI assistant, right in the app.

Want to turn off tailored ads and location sharing? See **Your Rights and Choices**.

### Lowe's Pro Supply App

Are you a Property Management Pro?  The Lowe's Pro Supply app is designed to help you save time and get what you need faster. You can use the app to place maintenance and repair orders directly from your local Lowe's Pro Supply branch. When you download the app, you can log in to your existing Pro Supply account, request a new one, or continue as a guest.  As you use the app, we may collect information about your orders, preferences, and how you interact with the app. We use this information to provide the services you request, personalize your experience, and make the app work better for you.

Want to learn more? See **Your Rights and Choices**.

### Lowe's Style Studio for Apple Vision Pro

The Lowe's Style Studio app lets you design your dream kitchen using Apple Vision Pro's immersive technology. Once you've created your design, you'll get a product list to make it a reality.

When you use the app, we collect information such as your **device** and **account details**, the products and designs you explore, and **usage data** that helps us keep the app running smoothly and make it better over time.

## Children's Privacy and Our Kids Club

We value the trust parents and families place in us when participating in the Lowe's Kids Club. This section

explains how we handle your children's personal information in connection with the program.

### What We Collect

When you sign your child up for the Lowe's Kids Club, we collect only your child's first name and date of birth. We do not require or collect any other personal information about your child.

### How We Use Children's Information

We use your child's information only to operate the Kids Club, such as to:

- Create and manage your Kids Club profile,
- Track their progress toward recognition and rewards, and
- Provide age-appropriate program features, such as birthday acknowledgments.

We do not use your child's information for advertising, marketing, or profiling, and will only use limited data associated with the events for analytics – like dates of attendance and age range of those attending.

### How We Share Children's Information

We do not share your child's personal information outside of Lowe's, **except with our trusted service providers who need the information to help us operate the Kids Club (for example, to send birthday acknowledgments or other program communications)**. The only time we may disclose your child's information is when required to respond to legal requests (such as subpoenas, court orders, or investigations) or to protect the safety and rights of Lowe's, our customers, or others.

### Parental Consent

We require your verifiable consent before collecting any of your child's information. Consent is confirmed through a text message verification code sent to you. You must provide consent each time you add a child to your Account or sign them up for the Kids Club.

### Parental Rights and Choices

You may:

- Review the information collected about your child,
- Correct or update your child's Kids Club information,
- Delete your child's Kids Club profile at any time through your MyLowe's account, or by contacting us, and
- Withdraw consent to stop further use or collection of your child's information.

When you delete your child's profile or withdraw consent, we will delete their information as soon as reasonably possible. We retain only limited records (such as the date and time consent was given) to confirm that parental consent was obtained, and solely for compliance with applicable law.

### Retention and Deletion

We keep your child's information **only as long as reasonably necessary to operate the Lowe's Kids Club**. Your child's information will be deleted when:

- You delete your child's profile,
- You withdraw consent by contacting us using the methods below, or
- Automatically when your child turns 18.

### Security

We use technical, administrative, and physical safeguards to protect your child's information. Access to your child's information is limited to those with a need to know for program operations and technical support.

### Contact Us

If you have questions about how we handle your child's information or would like to exercise your parental rights, please contact us at:

Privacy Office
1000 Lowe's Blvd., NB6LG
Mooresville, NC 28117
800-309-5732
privacy@lowes.com

## Customer Service and Mylow

We're here to help. You can contact our Customer Care team by phone, chat, or online message if you have a question or need support. You can also ask Mylow, our AI-powered assistant, for help with home improvement ideas and product questions.

When you reach out to Customer Care, we may ask for some basic information, like your **name, email,** and **phone number**, to look up your order or answer your question. If you're asking about a purchase or refund, we may also need **payment** or **transaction** details. Calls may be recorded or monitored for training and quality purposes.

If you chat with us online, please note that our chatbots are AI-powered and may share chat information with service providers who help us run the system.

You can also chat with Mylow on our website or through the Lowe's App. Mylow can give you project ideas, how-to guidance, and product recommendations. Mylow can't handle personal matters like taxes or health questions.

To protect your privacy, Mylow has filters to block sensitive information, but it's best not to enter anything personal or confidential into the chat. Information you share with Mylow may be processed by trusted partners who help us provide this service.

## Rewards Program and Discounts

We're proud to support our shoppers' home improvement journeys and their businesses**.** That's why we created the MyLowe's Rewards Program, for our DIY customers, and the MyLowe's Pro Rewards Program, for our Pro customers. As a member, you'll enjoy exclusive perks like special offers, member-only pricing, and points on eligible purchases that can be redeemed for rewards.

When you join, we'll collect some basic info like your **name**, **email**, **phone number**, and an **account password**.

If you're a Pro customer, we'll also ask you to provide us with your **business name, industry,** and **business address**. To make online shopping even easier, you can also save your **shipping address**, **payment,** and **billing info** to your Account.

We also learn from the way you shop and interact with our services — whether online, in store, or in our app — to better understand your preferences and personalize your experience. This helps us improve our service offerings and may include us adding helpful details to your profile, like frequently purchased products, or, for our DIY customers, **property measurements** or **estimated home value** from public records, to make your planning even easier. You can view this data within your MyLowe's Rewards account.

In some cases, we may ask you for **extra information** — like your product and service interests, whether you prefer to engage with us in Spanish or if you're a Lowe's employee, military member, or first responder—to provide you with better services or confirm your eligibility for special rewards or discounts. This information may be collected by us or one of our trusted partners to help us verify and apply your benefits.

### Notice of Financial Incentive Programs/Rewards Program Disclosures

We offer various financial incentives, including price discounts, rewards, coupons, services, and other perks (collectively, the "**Programs**"), including:

**MyLowe's Rewards Program.** Our rewards program provides do-it-yourself participants with access to rewards, offers, and promotions. (See additional terms **here**.) MyLowe's Rewards Credit Card holders may receive additional discounts described **here**.

**Military Discount Program.** We proudly offer a Military Discount for active-duty military, veterans, and their spouses. When you enroll, we use a third-party identity verification service to confirm your status as a military service member or spouse. (See additional terms **here**.)

**First Responder Discount Program.** At Lowe's, we thank first responders during Fire Safety Month and all year long. When you enroll, we use a third-party identity verification service to confirm your status as a first responder. (See additional terms **here**.)

**MyLowe's Pro Rewards Program.** Where Pro participants have access to rewards, offers, and promotions. (See additional terms **here**.) MyLowe's Pro Rewards Credit Card holders may receive additional discounts described **here**.

**Pro Member Volume Discounts**. If you are a MyLowe's Pro Rewards Program member, you may be eligible to receive better-than-shelf pricing on select items. (See additional terms **here**).

**Pro Member Paint Discounts.** If you are a MyLowe's Pro Rewards Program Member, you may be eligible to receive discount on certain qualifying paint purchases. (See additional terms **here**).

**Material Program Terms**. A summary of the program and material terms are provided in the links associated with each program listed above or are otherwise provided in the program offer (e.g., via email). Programs are subject to termination at any time at our sole discretion.

**Information Collected in the Programs**. To participate in some of these programs, you may be asked to provide personal information, like **name, email address, phone number, mailing address**, and **payment info**. We also collect information about your online activities and commercial information, like your transaction history. You may choose to provide other personal information, like **measurement data, pictures, property information**, **your children's information**, and details about your business. You may indicate your communications preferences in your online Account. We may also make inferences, like

your shopping preferences, using your Account activity.

**How We Share Info Collected Through Our Programs**. To learn more about how we share info collected in the Programs, read the **Information Collected From or Shared with Others** section.

For example, when necessary, we may share your information with trusted service providers who help us with things like:

- Installation, repairs or delivering products
- Processing and fulfilling orders
- Managing warranties and customer service
- Providing marketing and advertising support
- Performing data analysis and research
- Preventing fraud or handling calls
- Managing legal, compliance, or risk matters

We may also share information collected through these Programs with ad partners, social media platforms, and data analytics vendors to show you tailored ads and offers.

If you prefer not to receive tailored ads, you can opt out by following the steps in the **Your Rights and Choices** section. Please note that if you opt out, it will impact our ability to provide you with personalized offers, discounts, and promotions.

**How to Withdraw From Our Programs**. Joining any of our financial incentive programs is completely optional and you can leave a program at any time.

- Lowe's rewards or discount programs. To stop participating, contact our Customer Care team to deactivate your online account.
- Lowe's private-labeled payment cards. To end discounts associated with these cards, you can cancel the card directly with the issuing financial institution.
- Marketing-related incentives. If you no longer want to receive offers tied to our marketing emails or texts, you can unsubscribe using the link provided in our messages.

California residents, to opt out from all programs, you can submit a deletion request through the **Lowe's Privacy Portal** or by calling **1-800-309-5732, or** you can log onto the Lowe's app and delete a specific Account.

**What Happens if You Delete Your MyLowe's Rewards or MyLowe's Pro Rewards Account**. Our MyLowe's Rewards Programs are based on points that are linked to your unique membership identification number based on your purchases. If you ask us to delete your personal information, we will not be able to connect your purchases to your Account. That means you'll lose access to your member benefits, including any points or rewards you've earned.

**Once your Account is deleted, it can't be recovered.**

If you choose to exercise your privacy rights and it affects your participation in the Rewards Program, we'll let you know beforehand what that means for your membership or benefits before we make any changes.

The financial incentives we offer you are reasonably related to the value of your data to our business, based on our reasonable yet sole determination. We estimate the value of your personal information by considering the expenses incurred by the business related to the collection, storage and retention of personal information in the context of the programs and the expenses related to the provision of these programs. The value to our business of yours or any other customer's personal information is based on specific facts such as whether and to what extent you take advantage of any offerings and whether and to what extent you opt out of any offerings.

From time to time, we may provide additional terms that apply to a particular financial incentive program, which will be presented to you at the time you sign up for the program.

## Credit Cards and Financing

We offer a variety of private-branded credit cards that give cardholders access to special discounts and benefits. These cards are issued in partnership with financial institutions like Synchrony, American Express, and Mastercard. Any personal information collected by those companies is handled under their own privacy policies, not ours.

Want to learn more about our credit products? Click here.

Lowe's also makes available financing, credit, and payment plans for certain items or in connection with certain promotions, including **Lowe's Pay** and Lowe's Lease-to-Own, which are issued in partnership with financial institutions like Synchrony and Progressive Leasing, and also handled under their own privacy policies, not ours.

## Delivery, Installation, and Related Services

### Lowe's Delivery Options

Depending on what you buy, there are a few ways to get your order, like Same-Day Delivery, Truck Delivery, or Appliance Delivery.

In addition to the details we collect when you **shop online** or **check out in store**, we may need a little more information depending on your delivery choice.

- For Same-Day Delivery, we'll ask for your preferred delivery window.
- For Truck Delivery, you'll select a delivery date and time.
- For Appliance Delivery, you can choose optional haul-away services during checkout.

We may also use your **phone number** to send automated text updates about your order and delivery.

If you choose Same-Day Delivery, we will ask you to tell us the delivery window for your order. When you choose Truck Delivery, you must provide the delivery date and time. For Appliance Deliveries, you can choose to add haul away services as an additional product during checkout.

### Delivery Service Apps

We've partnered with trusted delivery services, like DoorDash, Instacart, and Shipt, so you can shop your way. If you order through one of these third-party apps, their privacy policies apply to any personal information you share with them, not ours.

When we get your order, we may get limited details, like your **contact info** and **what you purchased,** so we can fulfill it. If you link your **MyLowe's Rewards Account**, we typically exchange limited data (like purchases or preferences) to make sure you get the right rewards, offers, or surveys.

## Insights We Develop About You

We sometimes create or infer new information about you based on what we already collect. For example, we may analyze your purchases or online search activity to understand your preferences and make better recommendations.

We may also combine what we know about you with data from trusted third parties to help us spot trends, improve our services, personalize your experience, and show you more relevant offers and tailored ads — no matter how you shop with us.

## Information Collected From or Shared with Others

### Information We Receive from Others About You

To help serve you better, we may get information about you from trusted partners and sources. These may include marketing partners, service providers, Lowe's affiliates, or public records.

Here's what that may include:

- **Identification information.** We may get contact details like your **name, email, phone number**, or **address** from Lowe's affiliates, business partners, service providers, or others. For example, a delivery partner may confirm your **address**, an installer may share **photos** or notes about a project, or an email vendor may tell us if a message bounced back. We may also receive your details if someone places an order for you (for example, shipping a gift or scheduling a delivery).
- **Commercial and property information.** We may get purchase history or product information from Lowe's affiliates or partners. If you save an address in your online account, we may display publicly available property details, like square footage, number of rooms, or year built, to help you make home improvement decisions.
- **Inferences or preference information about you, protected class information under state or federal laws, professional or employment-related information, education background, and geolocation information.** We may get or infer information about your interests, preferences, or general demographics (like age range, language, or region) from partners such as data analytics firms, survey vendors, or public sources (for example, a customer review you post). In some cases, we may also receive sensitive demographic data (like race or ethnicity) in an aggregated or anonymous form from customers who provide it in connection with an online survey. This voluntary demographic information is collected solely to help ensure accurate survey sample representation. We do not sell this information.

**Information We Share with Others**

We share personal information with trusted partners who help us run our business, deliver orders, improve our services, provide you with the best experience, tailor ads just for you, and who help us protect our property, customers, associates and others.

- **Product and Service Providers.** We share information with companies that support us in areas like

delivery, installation, repairs, warranties, payments, financing, analytics, marketing (including promotions and contests), customer service, and fraud prevention. We also share information with partners who help us operate and secure our website, provide technical support, host our communications, manage our web or cloud infrastructure, and provide you with services that help you shop with us. For example, if you buy from a third-party supplier, we share only the details needed to complete your order or handle things like recalls or support. These partners use your information only to provide their service, not for their own marketing.

- **Marketplace Sellers.** Some products on our website come from independent marketplace sellers. When you buy from one, we share only what's necessary, like **your name, order details, and shipping address**, so they can fulfill your order.
- **Third Parties.** Sometimes we work with other companies that offer value-added services, for example, extended warranties, promotions, or joint marketing. We may also partner with advertising platforms to show you relevant offers from Lowe's or other brands. See **Advertising, Marketing, and Promotions** below for more on tailored advertising.
- **Legal and Safety Reasons.** We may share your information with law enforcement, regulators, or others if required by law or legal process, or when we believe doing so will help or is necessary to protect our customers, team, or business from fraud, threats, or illegal activity, and to collect debt or enforce our policies. To learn more about how and why we share personal information collected through ALPR technology, including sharing with law enforcement, see the **Automated License Plate Recognition** section.
- **Business Transfers.** If Lowe's merges with, sells, or transfers part or all of our business, your information may be included as part of that process.

## Advertising, Marketing, and Promotions

If you're wondering why you're seeing our ads online or if you're wondering about how we promote the products we sell, you've come to right place (and no, your phone is not listening to you).

Let's help you understand how it works.

### Tailored Ads, Sales, and Sharing of Personal Information

Although we do not sell personal information in exchange for money, some of our advertising, marketing, and analytics practices may be considered "sales" or "sharing" under some state privacy laws. This can include sharing things like **customer IDs, purchase details**, or **shopping preferences** with:

- Home improvement service partners (for example, when we team up to offer joint promotions), and
- Financial institutions (for example, when we work together on Lowe's private-label credit cards or analyze how those cards are used).

We also share information to show you tailored ads — what lawyers call "targeted" or "cross-context behavioral" advertising. This may include details like your **contact info, online activity, shopping history, job** or **professional details, general demographics** (such as age range or gender), and **insights** we draw from that information. We share this with our marketing partners, ad networks, and social media platforms so they can show you more relevant ads.

We don't sell or share your children's information. And to our knowledge, we don't sell or share the personal

information of anyone under 18. See **Children's Privacy and Our Kids Club** for information on how we collect and safeguard your child's information.

If you would like to opt out of these ads, or the sale or sharing of personal information, visit **Your Rights and Choices**.

No matter what else is in this Notice that may make you think otherwise, Lowe's doesn't share information from our text message programs — like your phone number or consent record — with outside companies for their own marketing unless you've given us permission.

### Our Events and Promotions

We love bringing customers together for special in-store and online events, like watch parties, workshops, sweepstakes, and other promotions. You may need a MyLowe's Rewards account to take part in certain events. So, make sure you check the details when signing up!

When you sign up, we collect basic details such as your name, contact information, and any related purchase info. Sometimes, someone else may register you (for example, signing up a friend or family member).

If you sign your child up for a Lowe's Kids Club event, we will also collect limited information about your child. See **Children's Privacy and Lowe's Kids Club** for information on how we collect and safeguard your child's information.

We use this information to manage attendance, send updates, and let you know if you've won a prize.

### Advertising or Promoting Third-Party Products and Services

Sometimes we team up with other brands to share promotions or ads we think you might like. Here's what that means:

A partner brand lets us know the type of audience they want to reach, and we show their ads to the right group of customers—either on our website or through partner platforms.

For example, a company that sells gardening tools might ask us to feature their products for customers interested in outdoor projects. We don't share your name or anything else that directly identifies you with these brands. If they want to know how their ads performed, we give them only **aggregated reports** — no names or personal details.

Some of these ads use cookies or similar tracking tools to collect limited information from your **browser** or **device**. We work with trusted partners who use this data to help us understand what our customers care about, see how our sites and ads are performing, and make our marketing more relevant to you.

If you'd rather not to see these tailored ads or want to limit this kind of data sharing, please see the section on **Opting Out of Targeted Advertising, Sales, and Sharing of Personal Information**.

## Your Rights and Choices

Personal information is, well, personal. You have options when it comes to how we collect, use, and disclose your personal information.

**Accessing Your Account Information**. If you created an account with us, you can directly access your Lowe's account profile and order history when you log into your Lowe's online account.

**Updating Your Personal Information**. We strive to make sure the personal information we maintain about you is accurate and up to date. If you would like to update your information, you have a few options:

- Log into your Account and navigate to the My Settings page
- Submit a request through the Lowe's Privacy Portal

**Email Preferences.** If you wish to opt out from receiving our promotional email communications, you can use the unsubscribe link in the emails you received from us.

Please note that if you opt out of our promotional emails, we may still send you email messages related to your Account or any services you request from us. Unsubscribing from our promotional emails will not affect the level or quality of service we provide to you.

**Opting Out of Targeted Advertising, Sales, and Sharing of Personal Information**.

- If you'd like to opt out of targeted ads, sales, or sharing of your personal information for cross-context behavioral advertising (remember, that's the lawyer speaking), please visit our Cookie Preference Center to submit your choices.
- You can also use the Global Privacy Control browser signal to opt out. If you choose to use a browser-based opt-out signal, you will be opted out of targeted advertising, sales, and sharing through tracking technologies such as cookies, and will need to turn it on for each browser you use.
- To submit a request to opt out of offline sales and sharing, please use the Lowe's Privacy Portal.

You can find similar options within our apps. Just go to My Account>Do Not Sell My Info.

Want to learn more? Check out our section.

**Text Messages**. To stop receiving marketing text/SMS messages from Lowe's, please reply STOP to the text message and note, replying STOP only applies to the phone number that got the text.

**Push Notifications**. To opt out from Lowe's push notifications, please adjust the permissions in your mobile device. This opt out does not apply to in-app notifications.

**App and In-Store Location Tracking**. To stop us from collecting your precise location information in our mobile app, please adjust the mobile device settings on your phone.

## State-Specific Privacy Rights

In addition to the options above, you may have additional privacy rights under the law of the state in which you live. This section describes the types of privacy requests available to residents of California, Colorado, Connecticut, Delaware, Indiana, Iowa, Kentucky, Maryland, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, Oregon, Rhode Island, Tennessee, Texas, Utah and Virginia (collectively "**Covered States**").

To submit a request relating to your personal information, please use the Lowe's Privacy Portal or call us at **1-800-309-5732**. When you submit a request, we'll ask for basic contact details (like your name, email, phone number, and address). Depending on the nature of your request, we or our verification vendor may require 2-3 pieces of personal information to verify your identity. If you have a password-protected account with us, we may verify your identity through our existing authentication practices for your Account.

We may also collect your language preference during this process to make things easier for you and provide you with the verification questions in your preferred language — it is deleted once your request is complete.

In some states and for some types of requests, you may designate an authorized agent to make a request for you— but for some requests you will need to verify your identity directly with us before your request can be processed. An authorized agent can submit a request on your behalf using the Lowe's Privacy Portal or calling

us at **1-800-309-5732**. We will not discriminate against you if you choose to exercise your privacy rights.

### California Privacy Rights

If you are a California resident, you have the right to submit certain requests relating to your personal information. These include:

**Right to Know.** California residents have the right to know:

- The categories of personal information we have collected about you, including:
  - The categories of sources from which the personal information was collected
  - Our business or commercial purposes for collecting, selling, or sharing personal information
  - The categories of recipients to which we disclose personal information
  - The categories of personal information that we sold or shared, and for each category identified, the categories of third parties to whom we sold or shared that particular category of personal information
  - The categories of personal information that we disclosed for a business purpose, and for each category identified, the categories of service providers or contractors to which we disclosed that particular category of personal information
- The specific pieces of personal information we have collected about you

**Deletion.** You have the right to request the deletion of personal information we collected from you, subject to certain exceptions. Where we use deidentification to satisfy a deletion request, we commit to maintaining and using the information in deidentified form and will not attempt to reidentify the information.

Please be aware that if you request to delete your personal information, all your information including your MyLowe's Rewards account and related points, rewards and perks will be deleted. We can't reinstate your account or those benefits if you later change your mind.

**Correction.** If you believe that your personal information is inaccurate, you may submit a request for us to correct that information. Upon receipt of a verifiable request to correct this information, we will use commercially reasonable efforts to correct the information as you direct and keep it corrected.

If you would like to change information related to your order or services, please contact a store associate or Lowe's Customer Care. You can also directly update your phone number, email address, stored payment method, and address through the account settings in your Lowe's online account.

**Right to Opt Out of Sales and Sharing of Personal Information.** You have the right to opt out of the sale of your personal information, and to request that we do not share your personal information for cross-context behavioral advertising (those lawyers again). For more information on how to use this right, please click here.

**Right to Limit Use and Disclosure of Sensitive Personal Information.** You may limit our use and disclosure of your sensitive personal information to uses/disclosures that are reasonably necessary to provide our goods and services, or as needed,

- to ensure security and integrity,
- to prevent fraud or illegal activity
- for physical safety,

- for short-term, transient use, including for non-personalized advertising
- to perform services on behalf of the business,
- and to verify or maintain the quality or safety of a service or device owned, manufactured, manufactured for, or controlled by us, and to improve, upgrade, or enhance such services or devices.

**California's Shine the Light Law.** California's "Shine the Light" law permits California consumers to opt out of our disclosure of your personal information to third parties for their direct marketing. You may do so by following the opt-out instructions **here**.

**Response Statistics.** To view statistics about the California customer data requests we received in 2024, please click **here**.

## Nevada Consumers

Nevada law provides consumers the right to opt out of the "sale" of "covered information" to third parties, including things like name, address, social security number, telephone number, email address, and other information through which a person may be contacted. Our uses of your personal information are not sales under Nevada law. If you have any questions or if you would like to us to email you should this change in the future, please contact us at **privacy@lowes.com**.

## Other Covered States

Are you a resident of a **Covered State** other than California or Nevada? If so, you are in the right place to learn more about your state specific rights.

**Access and Data Portability Request.** You can use this type of request to confirm whether we are processing your personal information, to access your personal information, and to obtain a copy of your personal information in a portable format. Depending on your state, you can also request that we provide you with information about the categories or specific third parties to whom we disclosed personal information.

**Deletion Request.** You may request that we delete your personal information, subject to exceptions. Where we use deidentification to satisfy a deletion request, we commit to maintaining and using the information in deidentified form and will not attempt to reidentify the information.

Please be aware that if you request us to delete your personal information, all your information including your MyLowe's Rewards account and related points, rewards and perks will be deleted. We can't reinstate your account or those benefits if you later change your mind.

**Correction Request.** You may request that we correct inaccuracies in your personal information taking into account the nature of the personal information and our purposes for processing it. If you would like to change information related to your order or services, please contact a store associate or Lowe's Customer Care. You can also directly update your phone number, email address, stored payment method, and address through the account settings in your Lowe's online account.

**Opt-Out Requests.** You have the right to opt out of the following uses of your personal information: (a) targeted advertising; (b) the sale of personal information; and (c) profiling in furtherance of decisions that produce legal or similarly significant effects concerning your economic situation, health, personal preferences, interests, reliability, behavior, location, or movements. We do not sell personal information for money and do not profile individuals in furtherance of decisions that produce legal or similarly significant effects under applicable state privacy laws.

For information on how to opt out of targeted advertising and/or non-monetary "sales" of personal

information, please click **here**.

**Revoke Consent.** If you consented to our collection or use of your personal information, you also have the right to revoke your consent.

**Appeal.** Sometimes we are unable to process requests relating to your personal information, in which case, your request will be denied. If your request has been denied by and you believe we denied it in error, you may appeal for reconsideration of your request.

## Who We Are and How to Contact Us

"**We**," "**us**," "**our**," and "**Lowes**" refer to Lowe's Companies, Inc., including our subsidiaries and affiliated entities.

If you have questions about this Privacy Notice or if you need access in a different language or format, please contact us here.

Privacy Office
1000 Lowe's Blvd., NB6LG
Mooresville, NC 28117
privacy@lowes.com

We may update this Privacy Notice from time to time so please check back here regularly for the most up to date version.

The last time we updated this Notice was March 11, 2026.

## What Haven't We Covered?

In addition to the other purposes for collection, use, and disclosure of personal information described in this Notice, we may collect, use, and disclose personal information as required by law, regulation or court order; to respond to governmental and/or law enforcement requests; to identify, contact or bring legal action against someone who may be causing injury to or interfering with our (or others') rights or property; for security and fraud prevention purposes; to support any actual or threatened claim, defense or declaration in a case or before any jurisdictional and/or administrative authority, arbitration or mediation panel; in connection with disciplinary actions/investigations; or as otherwise described at the time your personal information is collected. Likewise, we may use and disclose personal information to third parties in connection with the sale, assignment, merger, reorganization, or other transfer of any of our brands or companies.

This Privacy Notice does **not** apply to:

1. Job applicants — please click the link for our **Supplemental Privacy Notice.**
2. Credit-related products (such as Lowe's-branded credit cards), which are covered by the credit providers' privacy notices.
3. Lowe's Foundation and its charitable records.
4. Business Partners/Installers, Marketplace Sellers, Suppliers, Investors and Lowe's Creators — please click the link for our **Supplemental Privacy Notice.**
5. Lowe's employees.